NEW YORK *v.* UNITED STATES ET AL.

No. 91–543.   Argued March 30, 1992—Decided June 19, 1992*

---

*Together with No. 91–558, *County of Allegany, New York* v. *United States et al.,* and No. 91–563, *County of Cortland, New York* v. *United States et al.,* also on certiorari to the same court.

146

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined, and in Parts III-A and III-B of which WHITE, BLACKMUN, and STEVENS, JJ., joined. WHITE, J., filed an opinion concurring in part and dissenting in part, in which BLACKMUN and STEVENS, JJ., joined, *post*, p. 188. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 210.

148

*Peter H. Schiff*, Deputy Solicitor General of New York, argued the cause for petitioners in all cases. With him on the briefs for petitioner in No. 91–543 were *Robert Abrams*, Attorney General, *Jerry Boone*, Solicitor General, and *John McConnell*, Assistant Attorney General. *Edward F. Premo II* filed briefs for petitioner in No. 91–558. *Michael B. Gerrard, Deborah Goldberg*, and *Patrick M. Snyder* filed briefs for petitioner in No. 91–563.

*Deputy Solicitor General Wallace* argued the cause for the federal respondents in all cases. With him on the brief were *Solicitor General Starr, Acting Assistant Attorney General Hartman, Ronald J. Mann, Anne S. Almy, Louise F. Milkman,* and *Jeffrey P. Kehne. William B. Collins*, Senior Assistant Attorney General of Washington, argued the cause for the state respondents in Nos. 91–543 and 91–563. On the brief were *Kenneth O. Eikenberry*, Attorney General of Washington, *T. Travis Medlock*, Attorney General of South Carolina, and *James Patrick Hudson*, Deputy Attorney General, *Frankie Sue Del Papa*, Attorney General of Nevada, and *Allen T. Miller, Jr.*, Assistant Attorney General.†

---

†Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Lee Fisher*, Attorney General of Ohio, and *James O. Payne, Jr., Mary Kay Smith*, and *Patricia A. Delaney*, Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Daniel E. Lungren* of California, *Elizabeth Barrett-Anderson* of Guam, *Roland W. Burris* of Illinois, *Linley E. Pearson* of Indiana, *Chris Gorman* of Kentucky, *Michael E. Carpenter* of Maine, *Scott Harshbarger* of Massachusetts, *Don Stenberg* of Nebraska, *Robert J. Del Tufo* of New Jersey, *Ernest D. Preate, Jr.,* of Pennsylvania, *James E. O'Neil* of Rhode Island, *Mark W. Barnett* of South Dakota, *Dan Morales* of Texas, *Mario Palumbo* of West Virginia, and *James E. Doyle* of Wisconsin; and for the Council of State Governments by *Stewart Abercrombie Baker*.

Briefs of *amici curiae* urging affirmance were filed for the American College of Nuclear Physicians et al. by *Harold F. Reis;* for the American Federation of Labor and Congress of Industrial Organizations by *Robert M. Weinberg, David Silberman,* and *Laurence Gold;* and for the Rocky

JUSTICE O'CONNOR delivered the opinion of the Court.

These cases implicate one of our Nation's newest problems of public policy and perhaps our oldest question of constitutional law. The public policy issue involves the disposal of radioactive waste: In these cases, we address the constitutionality of three provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985, Pub. L. 99–240, 99 Stat. 1842, 42 U. S. C. § 2021b *et seq.* The constitutional question is as old as the Constitution: It consists of discerning the proper division of authority between the Federal Government and the States. We conclude that while Congress has substantial power under the Constitution to encourage the States to provide for the disposal of the radioactive waste generated within their borders, the Constitution does not confer upon Congress the ability simply to compel the States to do so. We therefore find that only two of the Act's three provisions at issue are consistent with the Constitution's allocation of power to the Federal Government.

## I

We live in a world full of low level radioactive waste. Radioactive material is present in luminous watch dials, smoke alarms, measurement devices, medical fluids, research materials, and the protective gear and construction materials used by workers at nuclear power plants. Low level radioactive waste is generated by the Government, by hospitals, by research institutions, and by various industries. The waste must be isolated from humans for long periods of time,

Mountain Low-Level Radioactive Waste Compact et al. by *Rex E. Lee, Carter G. Phillips, Richard D. Bernstein,* and *David K. Rees.*

Briefs of *amici curiae* were filed for the State of Connecticut by *Richard Blumenthal,* Attorney General, and *Aaron S. Bayer,* Deputy Attorney General; for the State of Michigan by *Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Thomas L. Casey, A. Michael Leffler,* and *John C. Scherbarth,* Assistant Attorneys General; and for US Ecology, Inc., by *Irwin Goldbloom.*

often for hundreds of years. Millions of cubic feet of low level radioactive waste must be disposed of each year. See App. 110a–111a; Berkovitz, Waste Wars: Did Congress "Nuke" State Sovereignty in the Low-Level Radioactive Waste Policy Amendments Act of 1985?, 11 Harv. Envtl. L. Rev. 437, 439–440 (1987).

Our Nation's first site for the land disposal of commercial low level radioactive waste opened in 1962 in Beatty, Nevada. Five more sites opened in the following decade: Maxey Flats, Kentucky (1963), West Valley, New York (1963), Hanford, Washington (1965), Sheffield, Illinois (1967), and Barnwell, South Carolina (1971). Between 1975 and 1978, the Illinois site closed because it was full, and water management problems caused the closure of the sites in Kentucky and New York. As a result, since 1979 only three disposal sites— those in Nevada, Washington, and South Carolina—have been in operation. Waste generated in the rest of the country must be shipped to one of these three sites for disposal. See Low-Level Radioactive Waste Regulation 39–40 (M. Burns ed. 1988).

In 1979, both the Washington and Nevada sites were forced to shut down temporarily, leaving South Carolina to shoulder the responsibility of storing low level radioactive waste produced in every part of the country. The Governor of South Carolina, understandably perturbed, ordered a 50% reduction in the quantity of waste accepted at the Barnwell site. The Governors of Washington and Nevada announced plans to shut their sites permanently. App. 142a, 152a.

Faced with the possibility that the Nation would be left with no disposal sites for low level radioactive waste, Congress responded by enacting the Low-Level Radioactive Waste Policy Act, Pub. L. 96–573, 94 Stat. 3347. Relying largely on a report submitted by the National Governors' Association, see App. 105a–141a, Congress declared a federal policy of holding each State "responsible for providing for the availability of capacity either within or outside the State

for the disposal of low-level radioactive waste generated within its borders," and found that such waste could be disposed of "most safely and efficiently . . . on a regional basis." §4(a)(1), 94 Stat. 3348. The 1980 Act authorized States to enter into regional compacts that, once ratified by Congress, would have the authority beginning in 1986 to restrict the use of their disposal facilities to waste generated within member States. §4(a)(2)(B), 94 Stat. 3348. The 1980 Act included no penalties for States that failed to participate in this plan.

By 1985, only three approved regional compacts had operational disposal facilities; not surprisingly, these were the compacts formed around South Carolina, Nevada, and Washington, the three sited States. The following year, the 1980 Act would have given these three compacts the ability to exclude waste from nonmembers, and the remaining 31 States would have had no assured outlet for their low level radioactive waste. With this prospect looming, Congress once again took up the issue of waste disposal. The result was the legislation challenged here, the Low-Level Radioactive Waste Policy Amendments Act of 1985.

The 1985 Act was again based largely on a proposal submitted by the National Governors' Association. In broad outline, the Act embodies a compromise among the sited and unsited States. The sited States agreed to extend for seven years the period in which they would accept low level radioactive waste from other States. In exchange, the unsited States agreed to end their reliance on the sited States by 1992.

The mechanics of this compromise are intricate. The Act directs: "Each State shall be responsible for providing, either by itself or in cooperation with other States, for the disposal of . . . low-level radioactive waste generated within the State," 42 U. S. C. §2021c(a)(1)(A), with the exception of certain waste generated by the Federal Government, §§2021c(a)(1)(B), 2021c(b). The Act authorizes States to

152

"enter into such [interstate] compacts as may be necessary to provide for the establishment and operation of regional disposal facilities for low-level radioactive waste." § 2021d(a)(2). For an additional seven years beyond the period contemplated by the 1980 Act, from the beginning of 1986 through the end of 1992, the three existing disposal sites "shall make disposal capacity available for low-level radioactive waste generated by any source," with certain exceptions not relevant here. § 2021e(a)(2). But the three States in which the disposal sites are located are permitted to exact a graduated surcharge for waste arriving from outside the regional compact—in 1986–1987, $10 per cubic foot; in 1988–1989, $20 per cubic foot; and in 1990–1992, $40 per cubic foot. § 2021e(d)(1). After the 7-year transition period expires, approved regional compacts may exclude radioactive waste generated outside the region. § 2021d(c).

The Act provides three types of incentives to encourage the States to comply with their statutory obligation to provide for the disposal of waste generated within their borders.

1. *Monetary incentives.* One quarter of the surcharges collected by the sited States must be transferred to an escrow account held by the Secretary of Energy. § 2021e (d)(2)(A). The Secretary then makes payments from this account to each State that has complied with a series of deadlines. By July 1, 1986, each State was to have ratified legislation either joining a regional compact or indicating an intent to develop a disposal facility within the State. §§ 2021e (e)(1)(A), 2021e(d)(2)(B)(i). By January 1, 1988, each unsited compact was to have identified the State in which its facility would be located, and each compact or stand-alone State was to have developed a siting plan and taken other identified steps. §§ 2021e(e)(1)(B), 2021e(d)(2)(B)(ii). By January 1, 1990, each State or compact was to have filed a complete application for a license to operate a disposal facility, or the Governor of any State that had not filed an application was to have certified that the State would be capable of disposing

of all waste generated in the State after 1992. §§ 2021e (e)(1)(C), 2021e(d)(2)(B)(iii). The rest of the account is to be paid out to those States or compacts able to dispose of all low level radioactive waste generated within their borders by January 1, 1993. § 2021e(d)(2)(B)(iv). Each State that has not met the 1993 deadline must either take title to the waste generated within its borders or forfeit to the waste generators the incentive payments it has received. § 2021e(d)(2)(C).

2. *Access incentives.* The second type of incentive involves the denial of access to disposal sites. States that fail to meet the July 1986 deadline may be charged twice the ordinary surcharge for the remainder of 1986 and may be denied access to disposal facilities thereafter. § 2021e(e)(2) (A). States that fail to meet the 1988 deadline may be charged double surcharges for the first half of 1988 and quadruple surcharges for the second half of 1988, and may be denied access thereafter. § 2021e(e)(2)(B). States that fail to meet the 1990 deadline may be denied access. § 2021e (e)(2)(C). Finally, States that have not filed complete applications by January 1, 1992, for a license to operate a disposal facility, or States belonging to compacts that have not filed such applications, may be charged triple surcharges. §§ 2021e(e)(1)(D), 2021e(e)(2)(D).

3. *The take title provision.* The third type of incentive is the most severe. The Act provides:

> "If a State (or, where applicable, a compact region) in which low-level radioactive waste is generated is unable to provide for the disposal of all such waste generated within such State or compact region by January 1, 1996, each State in which such waste is generated, upon the request of the generator or owner of the waste, shall take title to the waste, be obligated to take possession of the waste, and shall be liable for all damages directly or indirectly incurred by such generator or owner as a consequence of the failure of the State to take possession

of the waste as soon after January 1, 1996, as the genera-
tor or owner notifies the State that the waste is available
for shipment." § 2021e(d)(2)(C).

These three incentives are the focus of petitioners' constitu-
tional challenge.

In the seven years since the Act took effect, Congress has
approved nine regional compacts, encompassing 42 of the
States. All six unsited compacts and four of the unaffiliated
States have met the first three statutory milestones. Brief
for United States 10, n. 19; *id.*, at 13, n. 25.

New York, a State whose residents generate a relatively
large share of the Nation's low level radioactive waste, did
not join a regional compact. Instead, the State complied
with the Act's requirements by enacting legislation provid-
ing for the siting and financing of a disposal facility in New
York. The State has identified five potential sites, three in
Allegany County and two in Cortland County. Residents of
the two counties oppose the State's choice of location. App.
29a–30a, 66a–68a.

Petitioners—the State of New York and the two coun-
ties—filed this suit against the United States in 1990. They
sought a declaratory judgment that the Act is inconsistent
with the Tenth and Eleventh Amendments to the Constitu-
tion, with the Due Process Clause of the Fifth Amendment,
and with the Guarantee Clause of Article IV of the Constitu-
tion. The States of Washington, Nevada, and South Caro-
lina intervened as defendants. The District Court dis-
missed the complaint. 757 F. Supp. 10 (NDNY 1990). The
Court of Appeals affirmed. 942 F. 2d 114 (CA2 1991). Peti-
tioners have abandoned their due process and Eleventh
Amendment claims on their way up the appellate ladder; as
the cases stand before us, petitioners claim only that the Act
is inconsistent with the Tenth Amendment and the Guaran-
tee Clause.

## II

### A

In 1788, in the course of explaining to the citizens of New York why the recently drafted Constitution provided for federal courts, Alexander Hamilton observed: "The erection of a new government, whatever care or wisdom may distinguish the work, cannot fail to originate questions of intricacy and nicety; and these may, in a particular manner, be expected to flow from the the establishment of a constitution founded upon the total or partial incorporation of a number of distinct sovereignties." The Federalist No. 82, p. 491 (C. Rossiter ed. 1961). Hamilton's prediction has proved quite accurate. While no one disputes the proposition that "[t]he Constitution created a Federal Government of limited powers," *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991); and while the Tenth Amendment makes explicit that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"; the task of ascertaining the constitutional line between federal and state power has given rise to many of the Court's most difficult and celebrated cases. At least as far back as *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 324 (1816), the Court has resolved questions "of great importance and delicacy" in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States.

These questions can be viewed in either of two ways. In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I of the Constitution. See, *e. g., Perez* v. *United States*, 402 U. S. 146 (1971); *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819). In other cases the Court has sought to determine whether an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment. See, *e. g., Garcia* v. *San Antonio Metropolitan Transit Au-*

*thority,* 469 U. S. 528 (1985); *Lane County* v. *Oregon,* 7 Wall. 71 (1869). In a case like these, involving the division of authority between federal and state governments, the two inquiries are mirror images of each other. If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress. See *United States* v. *Oregon,* 366 U. S. 643, 649 (1961); *Case* v. *Bowles,* 327 U. S. 92, 102 (1946); *Oklahoma ex rel. Phillips* v. *Guy F. Atkinson Co.,* 313 U. S. 508, 534 (1941).

It is in this sense that the Tenth Amendment "states but a truism that all is retained which has not been surrendered." *United States* v. *Darby,* 312 U. S. 100, 124 (1941). As Justice Story put it, "[t]his amendment is a mere affirmation of what, upon any just reasoning, is a necessary rule of interpreting the constitution. Being an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to the state authorities." 3 J. Story, Commentaries on the Constitution of the United States 752 (1833). This has been the Court's consistent understanding: "The States unquestionably do retai[n] a significant measure of sovereign authority . . . to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." *Garcia* v. *San Antonio Metropolitan Transit Authority, supra,* at 549 (internal quotation marks omitted).

Congress exercises its conferred powers subject to the limitations contained in the Constitution. Thus, for example, under the Commerce Clause Congress may regulate publishers engaged in interstate commerce, but Congress is constrained in the exercise of that power by the First Amendment. The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed,

is essentially a tautology. Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs us to determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article I power.

The benefits of this federal structure have been extensively cataloged elsewhere, see, *e. g., Gregory* v. *Ashcroft, supra,* at 457–460; Merritt, The Guarantee Clause and State Autonomy: Federalism for a Third Century, 88 Colum. L. Rev. 1, 3–10 (1988); McConnell, Federalism: Evaluating the Founders' Design, 54 U. Chi. L. Rev. 1484, 1491–1511 (1987), but they need not concern us here. Our task would be the same even if one could prove that federalism secured no advantages to anyone. It consists not of devising our preferred system of government, but of understanding and applying the framework set forth in the Constitution. "The question is not what power the Federal Government ought to have but what powers in fact have been given by the people." *United States* v. *Butler,* 297 U. S. 1, 63 (1936).

This framework has been sufficiently flexible over the past two centuries to allow for enormous changes in the nature of government. The Federal Government undertakes activities today that would have been unimaginable to the Framers in two senses; first, because the Framers would not have conceived that *any* government would conduct such activities; and second, because the Framers would not have believed that the *Federal* Government, rather than the States, would assume such responsibilities. Yet the powers conferred upon the Federal Government by the Constitution were phrased in language broad enough to allow for the expansion of the Federal Government's role. Among the provisions of the Constitution that have been particularly important in this regard, three concern us here.

First, the Constitution allocates to Congress the power "[t]o regulate Commerce . . . among the several States."

Art. I, §8, cl. 3. Interstate commerce was an established feature of life in the late 18th century. See, *e. g.*, The Federalist No. 42, p. 267 (C. Rossiter ed. 1961) ("The defect of power in the existing Confederacy to regulate the commerce between its several members [has] been clearly pointed out by experience"). The volume of interstate commerce and the range of commonly accepted objects of government regulation have, however, expanded considerably in the last 200 years, and the regulatory authority of Congress has expanded along with them. As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power. See, *e. g., Katzenbach* v. *McClung*, 379 U. S. 294 (1964); *Wickard* v. *Filburn*, 317 U. S. 111 (1942).

Second, the Constitution authorizes Congress "to pay the Debts and provide for the . . . general Welfare of the United States." Art. I, §8, cl. 1. As conventional notions of the proper objects of government spending have changed over the years, so has the ability of Congress to "fix the terms on which it shall disburse federal money to the States." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). Compare, *e. g., United States* v. *Butler, supra,* at 72–75 (spending power does not authorize Congress to subsidize farmers), with *South Dakota* v. *Dole*, 483 U. S. 203 (1987) (spending power permits Congress to condition highway funds on States' adoption of minimum drinking age). While the spending power is "subject to several general restrictions articulated in our cases," *id.*, at 207, these restrictions have not been so severe as to prevent the regulatory authority of Congress from generally keeping up with the growth of the federal budget.

The Court's broad construction of Congress' power under the Commerce and Spending Clauses has of course been guided, as it has with respect to Congress' power generally, by the Constitution's Necessary and Proper Clause, which

authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." U. S. Const., Art. I, § 8, cl. 18. See, *e. g., Legal Tender Case,* 110 U. S. 421, 449–450 (1884); *McCulloch* v. *Maryland,* 4 Wheat., at 411–421.

Finally, the Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U. S. Const., Art. VI, cl. 2. As the Federal Government's willingness to exercise power within the confines of the Constitution has grown, the authority of the States has correspondingly diminished to the extent that federal and state policies have conflicted. See, *e. g., Shaw* v. *Delta Air Lines, Inc.,* 463 U. S. 85 (1983). We have observed that the Supremacy Clause gives the Federal Government "a decided advantage in th[e] delicate balance" the Constitution strikes between state and federal power. *Gregory* v. *Ashcroft,* 501 U. S., at 460.

The actual scope of the Federal Government's authority with respect to the States has changed over the years, therefore, but the constitutional structure underlying and limiting that authority has not. In the end, just as a cup may be half empty or half full, it makes no difference whether one views the question at issue in these cases as one of ascertaining the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the States under the Tenth Amendment. Either way, we must determine whether any of the three challenged provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985 oversteps the boundary between federal and state authority.

B

Petitioners do not contend that Congress lacks the power to regulate the disposal of low level radioactive waste. Space in radioactive waste disposal sites is frequently sold

by residents of one State to residents of another. Regulation of the resulting interstate market in waste disposal is therefore well within Congress' authority under the Commerce Clause. Cf. *Philadelphia* v. *New Jersey,* 437 U. S. 617, 621–623 (1978); *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources,* 504 U. S. 353, 359 (1992). Petitioners likewise do not dispute that under the Supremacy Clause Congress could, if it wished, pre-empt state radioactive waste regulation. Petitioners contend only that the Tenth Amendment limits the power of Congress to regulate in the way it has chosen. Rather than addressing the problem of waste disposal by directly regulating the generators and disposers of waste, petitioners argue, Congress has impermissibly directed the States to regulate in this field.

Most of our recent cases interpreting the Tenth Amendment have concerned the authority of Congress to subject state governments to generally applicable laws. The Court's jurisprudence in this area has traveled an unsteady path. See *Maryland* v. *Wirtz,* 392 U. S. 183 (1968) (state schools and hospitals are subject to Fair Labor Standards Act); *National League of Cities* v. *Usery,* 426 U. S. 833 (1976) (overruling *Wirtz*) (state employers are *not* subject to Fair Labor Standards Act); *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528 (1985) (overruling *National League of Cities*) (state employers are once again subject to Fair Labor Standards Act). See also *New York* v. *United States,* 326 U. S. 572 (1946); *Fry* v. *United States,* 421 U. S. 542 (1975); *Transportation Union* v. *Long Island R. Co.,* 455 U. S. 678 (1982); *EEOC* v. *Wyoming,* 460 U. S. 226 (1983); *South Carolina* v. *Baker,* 485 U. S. 505 (1988); *Gregory* v. *Ashcroft, supra.* This litigation presents no occasion to apply or revisit the holdings of any of these cases, as this is not a case in which Congress has subjected a State to the same legislation applicable to private parties. Cf. *FERC* v. *Mississippi,* 456 U. S. 742, 758–759 (1982).

This litigation instead concerns the circumstances under which Congress may use the States as implements of regulation; that is, whether Congress may direct or otherwise motivate the States to regulate in a particular field or a particular way. Our cases have established a few principles that guide our resolution of the issue.

1

As an initial matter, Congress may not simply "commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 288 (1981). In *Hodel*, the Court upheld the Surface Mining Control and Reclamation Act of 1977 precisely because it did *not* "commandeer" the States into regulating mining. The Court found that "the States are not compelled to enforce the steep-slope standards, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever. If a State does not wish to submit a proposed permanent program that complies with the Act and implementing regulations, the full regulatory burden will be borne by the Federal Government." *Ibid.*

The Court reached the same conclusion the following year in *FERC* v. *Mississippi, supra.* At issue in *FERC* was the Public Utility Regulatory Policies Act of 1978, a federal statute encouraging the States in various ways to develop programs to combat the Nation's energy crisis. We observed that "this Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations." *Id.*, at 761–762. As in *Hodel*, the Court upheld the statute at issue because it did not view the statute as such a command. The Court emphasized: "Titles I and III of [the Public Utility Regulatory Policies Act of 1978 (PURPA)] require *only consideration* of federal standards. And if a State has no utilities commission, or simply stops regulating in the field, it need not even entertain the federal

proposals." 456 U. S., at 764 (emphasis in original). Because "[t]here [wa]s nothing in PURPA 'directly compelling' the States to enact a legislative program," the statute was not inconsistent with the Constitution's division of authority between the Federal Government and the States. *Id.*, at 765 (quoting *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra,* at 288). See also *South Carolina* v. *Baker, supra,* at 513 (noting "the possibility that the Tenth Amendment might set some limits on Congress' power to compel States to regulate on' behalf of federal interests"); *Garcia* v. *San Antonio Metropolitan Transit Authority, supra,* at 556 (same).

These statements in *FERC* and *Hodel* were not innovations. While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions. See *Coyle* v. *Smith,* 221 U. S. 559, 565 (1911). The Court has been explicit about this distinction. "Both the States and the United States existed before the Constitution. The people, through that instrument, established a more perfect union by substituting a national government, acting, with ample power, *directly upon the citizens,* instead of the Confederate government, which acted with powers, greatly restricted, only upon the States." *Lane County* v. *Oregon,* 7 Wall., at 76 (emphasis added). The Court has made the same point with more rhetorical flourish, although perhaps with less precision, on a number of occasions. In Chief Justice Chase's much-quoted words, "the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." *Texas* v. *White,* 7 Wall. 700, 725 (1869). See also *Metcalf & Eddy* v. *Mitchell,* 269

U. S. 514, 523 (1926) ("[N]either government may destroy the other nor curtail in any substantial manner the exercise of its powers"); *Tafflin* v. *Levitt*, 493 U. S. 455, 458 (1990) ("[U]nder our federal system, the States possess sovereignty concurrent with that of the Federal Government"); *Gregory* v. *Ashcroft*, 501 U. S., at 461 ("[T]he States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere").

Indeed, the question whether the Constitution should permit Congress to employ state governments as regulatory agencies was a topic of lively debate among the Framers. Under the Articles of Confederation, Congress lacked the authority in most respects to govern the people directly. In practice, Congress "could not directly tax or legislate upon individuals; it had no explicit 'legislative' or 'governmental' power to make binding 'law' enforceable as such." Amar, Of Sovereignty and Federalism, 96 Yale L. J. 1425, 1447 (1987).

The inadequacy of this governmental structure was responsible in part for the Constitutional Convention. Alexander Hamilton observed: "The great and radical vice in the construction of the existing Confederation is in the principle of LEGISLATION for STATES or GOVERNMENTS, in their CORPORATE or COLLECTIVE CAPACITIES, and as contradistinguished from the INDIVIDUALS of whom they consist." The Federalist No. 15, p. 108 (C. Rossiter ed. 1961). As Hamilton saw it, "we must resolve to incorporate into our plan those ingredients which may be considered as forming the characteristic difference between a league and a government; we must extend the authority of the Union to the persons of the citizens—the only proper objects of government." *Id.*, at 109. The new National Government "must carry its agency to the persons of the citizens. It must stand in need of no intermediate legislations . . . . The government of the Union, like that of each State, must be able to address itself immediately to the hopes and fears of individuals." *Id.*, No. 16, at 116.

The Convention generated a great number of proposals for the structure of the new Government, but two quickly took center stage. Under the Virginia Plan, as first introduced by Edmund Randolph, Congress would exercise legislative authority directly upon individuals, without employing the States as intermediaries. 1 Records of the Federal Convention of 1787, p. 21 (M. Farrand ed. 1911). Under the New Jersey Plan, as first introduced by William Paterson, Congress would continue to require the approval of the States before legislating, as it had under the Articles of Confederation. 1 *id.*, at 243–244. These two plans underwent various revisions as the Convention progressed, but they remained the two primary options discussed by the delegates. One frequently expressed objection to the New Jersey Plan was that it might require the Federal Government to coerce the States into implementing legislation. As Randolph explained the distinction, "[t]he true question is whether we shall adhere to the federal plan [*i. e.*, the New Jersey Plan], or introduce the national plan. The insufficiency of the former has been fully displayed .... There are but two modes, by which the end of a Gen[eral] Gov[ernment] can be attained: the 1st is by coercion as proposed by Mr. P[aterson's] plan[, the 2nd] by real legislation as prop[osed] by the other plan. Coercion [is] *impracticable, expensive, cruel to individuals.* ... We must resort therefore to a national *Legislation over individuals.*" 1 *id.*, at 255–256 (emphasis in original). Madison echoed this view: "The practicability of making laws, with coercive sanctions, for the States as political bodies, had been exploded on all hands." 2 *id.*, at 9.

Under one preliminary draft of what would become the New Jersey Plan, state governments would occupy a position relative to Congress similar to that contemplated by the Act at issue in these cases: "[T]he laws of the United States ought, as far as may be consistent with the common interests of the Union, to be carried into execution by the judiciary and executive officers of the respective states, wherein the exe-

cution thereof is required." 3 *id.*, at 616. This idea apparently never even progressed so far as to be debated by the delegates, as contemporary accounts of the Convention do not mention any such discussion. The delegates' many descriptions of the Virginia and New Jersey Plans speak only in general terms about whether Congress was to derive its authority from the people or from the States, and whether it was to issue directives to individuals or to States. See 1 *id.*, at 260–280.

In the end, the Convention opted for a Constitution in which Congress would exercise its legislative authority directly over individuals rather than over States; for a variety of reasons, it rejected the New Jersey Plan in favor of the Virginia Plan. 1 *id.*, at 313. This choice was made clear to the subsequent state ratifying conventions. Oliver Ellsworth, a member of the Connecticut delegation in Philadelphia, explained the distinction to his State's convention: "This Constitution does not attempt to coerce sovereign bodies, states, in their political capacity. . . . But this legal coercion singles out the . . . individual." 2 J. Elliot, Debates on the Federal Constitution 197 (2d ed. 1863). Charles Pinckney, another delegate at the Constitutional Convention, emphasized to the South Carolina House of Representatives that in Philadelphia "the necessity of having a government which should at once operate upon the people, and not upon the states, was conceived to be indispensable by every delegation present." 4 *id.*, at 256. Rufus King, one of Massachusetts' delegates, returned home to support ratification by recalling the Commonwealth's unhappy experience under the Articles of Confederation and arguing: "Laws, to be effective, therefore, must not be laid on states, but upon individuals." 2 *id.*, at 56. At New York's convention, Hamilton (another delegate in Philadelphia) exclaimed: "But can we believe that one state will ever suffer itself to be used as an instrument of coercion? The thing is a dream; it is impossible. Then we are brought to this dilemma—either a federal

standing army is to enforce the requisitions, or the federal treasury is left without supplies, and the government without support. What, sir, is the cure for this great evil? Nothing, but to enable the national laws to operate on individuals, in the same manner as those of the states do." 2 *id.*, at 233. At North Carolina's convention, Samuel Spencer recognized that "all the laws of the Confederation were binding on the states in their political capacities, . . . but now the thing is entirely different. The laws of Congress will be binding on individuals." 4 *id.*, at 153.

In providing for a stronger central government, therefore, the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States. As we have seen, the Court has consistently respected this choice. We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts. *E. g.*, *FERC* v. *Mississippi*, 456 U. S., at 762–766; *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S., at 288–289; *Lane County* v. *Oregon*, 7 Wall., at 76. The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.

### 2

This is not to say that Congress lacks the ability to encourage a State to regulate in a particular way, or that Congress may not hold out incentives to the States as a method of influencing a State's policy choices. Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal interests. Two of these methods are of particular relevance here.

First, under Congress' spending power, "Congress may attach conditions on the receipt of federal funds." *South Dakota* v. *Dole*, 483 U. S., at 206. Such conditions must (among other requirements) bear some relationship to the purpose of the federal spending, *id.*, at 207–208, and n. 3; otherwise, of course, the spending power could render academic the Constitution's other grants and limits of federal authority. Where the recipient of federal funds is a State, as is not unusual today, the conditions attached to the funds by Congress may influence a State's legislative choices. See Kaden, Politics, Money, and State Sovereignty: The Judicial Role, 79 Colum. L. Rev. 847, 874–881 (1979). *Dole* was one such case: The Court found no constitutional flaw in a federal statute directing the Secretary of Transportation to withhold federal highway funds from States failing to adopt Congress' choice of a minimum drinking age. Similar examples abound. See, *e. g.*, *Fullilove* v. *Klutznick*, 448 U. S. 448, 478–480 (1980); *Massachusetts* v. *United States*, 435 U. S. 444, 461–462 (1978); *Lau* v. *Nichols*, 414 U. S. 563, 568–569 (1974); *Oklahoma* v. *United States Civil Service Comm'n*, 330 U. S. 127, 142–144 (1947).

Second, where Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress' power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation. *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra*, at 288. See also *FERC* v. *Mississippi, supra*, at 764–765. This arrangement, which has been termed "a program of cooperative federalism," *Hodel, supra*, at 289, is replicated in numerous federal statutory schemes. These include the Clean Water Act, 86 Stat. 816, as amended, 33 U. S. C. § 1251 *et seq.*, see *Arkansas* v. *Oklahoma*, 503 U. S. 91, 101 (1992) (Clean Water Act "anticipates a partnership between the States and the Federal Government, animated by a shared objective"); the Occupational Safety and Health Act of 1970,

84 Stat. 1590, 29 U. S. C. § 651 *et seq.*, see *Gade* v. *National Solid Wastes Management Assn.*, *ante*, at 97; the Resource Conservation and Recovery Act of 1976, 90 Stat. 2796, as amended, 42 U. S. C. § 6901 *et seq.*, see *Department of Energy* v. *Ohio*, 503 U. S. 607, 611–612 (1992); and the Alaska National Interest Lands Conservation Act, 94 Stat. 2374, 16 U. S. C. § 3101 *et seq.*, see *Kenaitze Indian Tribe* v. *Alaska*, 860 F. 2d 312, 314 (CA9 1988), cert. denied, 491 U. S. 905 (1989).

By either of these methods, as by any other permissible method of encouraging a State to conform to federal policy choices, the residents of the State retain the ultimate decision as to whether or not the State will comply. If a State's citizens view federal policy as sufficiently contrary to local interests, they may elect to decline a federal grant. If state residents would prefer their government to devote its attention and resources to problems other than those deemed important by Congress, they may choose to have the Federal Government rather than the State bear the expense of a federally mandated regulatory program, and they may continue to supplement that program to the extent state law is not pre-empted. Where Congress encourages state regulation rather than compelling it, state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people.

By contrast, where the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished. If the citizens of New York, for example, do not consider that making provision for the disposal of radioactive waste is in their best interest, they may elect state officials who share their view. That view can always be pre-empted under the Supremacy Clause if it is contrary to the national view, but in such a case it is the Federal Government that makes the decision in full view of the public, and it will be federal officials that suffer the consequences if the decision turns out to be detrimental or unpopular.

But where the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision. Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation. See Merritt, 88 Colum. L. Rev., at 61–62; La Pierre, Political Accountability in the National Political Process—The Alternative to Judicial Review of Federalism Issues, 80 Nw. U. L. Rev. 577, 639–665 (1985).

With these principles in mind, we turn to the three challenged provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985.

## III

The parties in these cases advance two quite different views of the Act. As petitioners see it, the Act imposes a requirement directly upon the States that they regulate in the field of radioactive waste disposal in order to meet Congress' mandate that "[e]ach State shall be responsible for providing . . . for the disposal of . . . low-level radioactive waste." 42 U. S. C. § 2021c(a)(1)(A). Petitioners understand this provision as a direct command from Congress, enforceable independent of the three sets of incentives provided by the Act. Respondents, on the other hand, read this provision together with the incentives, and see the Act as affording the States three sets of choices. According to respondents, the Act permits a State to choose first between regulating pursuant to federal standards and losing the right to a share of the Secretary of Energy's escrow account; to choose second between regulating pursuant to federal standards and progressively losing access to disposal sites in other States; and to choose third between regulating pursuant to federal standards and taking title to the waste generated within the State.

Respondents thus interpret § 2021c(a)(1)(A), despite the statute's use of the word "shall," to provide no more than an option which a State may elect or eschew.

The Act could plausibly be understood either as a mandate to regulate or as a series of incentives. Under petitioners' view, however, § 2021c(a)(1)(A) of the Act would clearly "commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S., at 288. We must reject this interpretation of the provision for two reasons. First, such an outcome would, to say the least, "upset the usual constitutional balance of federal and state powers." *Gregory* v. *Ashcroft*, 501 U. S., at 460. "[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides this balance," *ibid.* (internal quotation marks omitted), but the Act's amenability to an equally plausible alternative construction prevents us from possessing such certainty. Second, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568, 575 (1988). This rule of statutory construction pushes us away from petitioners' understanding of § 2021c (a)(1)(A) of the Act, under which it compels the States to regulate according to Congress' instructions.

We therefore decline petitioners' invitation to construe § 2021c(a)(1)(A), alone and in isolation, as a command to the States independent of the remainder of the Act. Construed as a whole, the Act comprises three sets of "incentives" for the States to provide for the disposal of low level radioactive waste generated within their borders. We consider each in turn.

## A

The first set of incentives works in three steps. First, Congress has authorized States with disposal sites to impose a surcharge on radioactive waste received from other States. Second, the Secretary of Energy collects a portion of this surcharge and places the money in an escrow account. Third, States achieving a series of milestones receive portions of this fund.

The first of these steps is an unexceptionable exercise of Congress' power to authorize the States to burden interstate commerce. While the Commerce Clause has long been understood to limit the States' ability to discriminate against interstate commerce, see, *e. g., Wyoming* v. *Oklahoma,* 502 U. S. 437, 454–455 (1992); *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Society for Relief of Distressed Pilots,* 12 How. 299 (1852), that limit may be lifted, as it has been here, by an expression of the "unambiguous intent" of Congress. *Wyoming, supra,* at 458; *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 427–431 (1946). Whether or not the States would be permitted to burden the interstate transport of low level radioactive waste in the absence of Congress' approval, the States can clearly do so *with* Congress' approval, which is what the Act gives them.

The second step, the Secretary's collection of a percentage of the surcharge, is no more than a federal tax on interstate commerce, which petitioners do not claim to be an invalid exercise of either Congress' commerce or taxing power. Cf. *United States* v. *Sanchez,* 340 U. S. 42, 44–45 (1950); *Steward Machine Co.* v. *Davis,* 301 U. S. 548, 581–583 (1937).

The third step is a conditional exercise of Congress' authority under the Spending Clause: Congress has placed conditions—the achievement of the milestones—on the receipt of federal funds. Petitioners do not contend that Congress has exceeded its authority in any of the four respects our cases have identified. See generally *South Dakota* v. *Dole,* 483 U. S., at 207–208. The expenditure is for the general

welfare, *Helvering* v. *Davis*, 301 U. S. 619, 640–641 (1937); the States are required to use the money they receive for the purpose of assuring the safe disposal of radioactive waste. 42 U. S. C. § 2021e(d)(2)(E). The conditions imposed are unambiguous, *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S., at 17; the Act informs the States exactly what they must do and by when they must do it in order to obtain a share of the escrow account. The conditions imposed are reasonably related to the purpose of the expenditure, *Massachusetts* v. *United States*, 435 U. S., at 461; both the conditions and the payments embody Congress' efforts to address the pressing problem of radioactive waste disposal. Finally, petitioners do not claim that the conditions imposed by the Act violate any independent constitutional prohibition. *Lawrence County* v. *Lead-Deadwood School Dist. No. 40–1*, 469 U. S. 256, 269–270 (1985).

Petitioners contend nevertheless that the *form* of these expenditures removes them from the scope of Congress' spending power. Petitioners emphasize the Act's instruction to the Secretary of Energy to "deposit all funds received in a special escrow account. The funds so deposited shall not be the property of the United States." 42 U. S. C. § 2021e(d)(2)(A). Petitioners argue that because the money collected and redisbursed to the States is kept in an account separate from the general treasury, because the Secretary holds the funds only as a trustee, and because the States themselves are largely able to control whether they will pay into the escrow account or receive a share, the Act "in no manner calls for the spending of federal funds." Reply Brief for Petitioner State of New York 6.

The Constitution's grant to Congress of the authority to "pay the Debts and provide for the . . . general Welfare" has never, however, been thought to mandate a particular form of accounting. A great deal of federal spending comes from segregated trust funds collected and spent for a particular purpose. See, *e. g.*, 23 U. S. C. § 118 (Highway Trust Fund);

42 U. S. C. § 401(a) (Federal Old-Age and Survivors Insurance Trust Fund); 42 U. S. C. § 401(b) (Federal Disability Insurance Trust Fund); 42 U. S. C. § 1395t (Federal Supplementary Medical Insurance Trust Fund). The Spending Clause has never been construed to deprive Congress of the power to structure federal spending in this manner. Petitioners' argument regarding the States' ability to determine the escrow account's income and disbursements ignores the fact that Congress specifically provided the States with this ability as a method of encouraging the States to regulate according to the federal plan. That the States are able to choose whether they will receive federal funds does not make the resulting expenditures any less federal; indeed, the location of such choice in the States is an inherent element in any conditional exercise of Congress' spending power.

The Act's first set of incentives, in which Congress has conditioned grants to the States upon the States' attainment of a series of milestones, is thus well within the authority of Congress under the Commerce and Spending Clauses. Because the first set of incentives is supported by affirmative constitutional grants of power to Congress, it is not inconsistent with the Tenth Amendment.

### B

In the second set of incentives, Congress has authorized States and regional compacts with disposal sites gradually to increase the cost of access to the sites, and then to deny access altogether, to radioactive waste generated in States that do not meet federal deadlines. As a simple regulation, this provision would be within the power of Congress to authorize the States to discriminate against interstate commerce. See *Northeast Bancorp, Inc.* v. *Board of Governors, FRS,* 472 U. S. 159, 174–175 (1985). Where federal regulation of private activity is within the scope of the Commerce Clause, we have recognized the ability of Congress to offer States the choice of regulating that activity according to fed-

eral standards or having state law pre-empted by federal regulation. See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S., at 288; *FERC* v. *Mississippi*, 456 U. S., at 764–765.

This is the choice presented to nonsited States by the Act's second set of incentives: States may either regulate the disposal of radioactive waste according to federal standards by attaining local or regional self-sufficiency, or their residents who produce radioactive waste will be subject to federal regulation authorizing sited States and regions to deny access to their disposal sites. The affected States are not compelled by Congress to regulate, because any burden caused by a State's refusal to regulate will fall on those who generate waste and find no outlet for its disposal, rather than on the State as a sovereign. A State whose citizens do not wish it to attain the Act's milestones may devote its attention and its resources to issues its citizens deem more worthy; the choice remains at all times with the residents of the State, not with Congress. The State need not expend any funds, or participate in any federal program, if local residents do not view such expenditures or participation as worthwhile. Cf. *Hodel, supra*, at 288. Nor must the State abandon the field if it does not accede to federal direction; the State may continue to regulate the generation and disposal of radioactive waste in any manner its citizens see fit.

The Act's second set of incentives thus represents a conditional exercise of Congress' commerce power, along the lines of those we have held to be within Congress' authority. As a result, the second set of incentives does not intrude on the sovereignty reserved to the States by the Tenth Amendment.

## C

The take title provision is of a different character. This third so-called "incentive" offers States, as an alternative to regulating pursuant to Congress' direction, the option of taking title to and possession of the low level radioactive waste

generated within their borders and becoming liable for all damages waste generators suffer as a result of the States' failure to do so promptly. In this provision, Congress has crossed the line distinguishing encouragement from coercion.

We must initially reject respondents' suggestion that, because the take title provision will not take effect until January 1, 1996, petitioners' challenge thereto is unripe. It takes many years to develop a new disposal site. All parties agree that New York must take action now in order to avoid the take title provision's consequences, and no party suggests that the State's waste generators will have ceased producing waste by 1996. The issue is thus ripe for review. Cf. *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 201 (1983); *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 144–145 (1974).

The take title provision offers state governments a "choice" of either accepting ownership of waste or regulating according to the instructions of Congress. Respondents do not claim that the Constitution would authorize Congress to impose either option as a freestanding requirement. On one hand, the Constitution would not permit Congress simply to transfer radioactive waste from generators to state governments. Such a forced transfer, standing alone, would in principle be no different than a congressionally compelled subsidy from state governments to radioactive waste producers. The same is true of the provision requiring the States to become liable for the generators' damages. Standing alone, this provision would be indistinguishable from an Act of Congress directing the States to assume the liabilities of certain state residents. Either type of federal action would "commandeer" state governments into the service of federal regulatory purposes, and would for this reason be inconsistent with the Constitution's division of authority between federal and state governments. On the other hand, the second alternative held out to state governments—regulating pur-

suant to Congress' direction—would, standing alone, present a simple command to state governments to implement legislation enacted by Congress. As we have seen, the Constitution does not empower Congress to subject state governments to this type of instruction.

Because an instruction to state governments to take title to waste, standing alone, would be beyond the authority of Congress, and because a direct order to regulate, standing alone, would also be beyond the authority of Congress, it follows that Congress lacks the power to offer the States a choice between the two. Unlike the first two sets of incentives, the take title incentive does not represent the conditional exercise of any congressional power enumerated in the Constitution. In this provision, Congress has not held out the threat of exercising its spending power or its commerce power; it has instead held out the threat, should the States not regulate according to one federal instruction, of simply forcing the States to submit to another federal instruction. A choice between two unconstitutionally coercive regulatory techniques is no choice at all. Either way, "the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program," *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra,* at 288, an outcome that has never been understood to lie within the authority conferred upon Congress by the Constitution.

Respondents emphasize the latitude given to the States to implement Congress' plan. The Act enables the States to regulate pursuant to Congress' instructions in any number of different ways. States may avoid taking title by contracting with sited regional compacts, by building a disposal site alone or as part of a compact, or by permitting private parties to build a disposal site. States that host sites may employ a wide range of designs and disposal methods, subject only to broad federal regulatory limits. This line of reasoning, however, only underscores the critical alternative a

State lacks: A State may not decline to administer the federal program.  No matter which path the State chooses, it must follow the direction of Congress.

The take title provision appears to be unique.  No other federal statute has been cited which offers a state government no option other than that of implementing legislation enacted by Congress.  Whether one views the take title provision as lying outside Congress' enumerated powers, or as infringing upon the core of state sovereignty reserved by the Tenth Amendment, the provision is inconsistent with the federal structure of our Government established by the Constitution.

## IV

Respondents raise a number of objections to this understanding of the limits of Congress' power.

## A

The United States proposes three alternative views of the constitutional line separating state and federal authority. While each view concedes that Congress *generally* may not compel state governments to regulate pursuant to federal direction, each purports to find a limited domain in which such coercion is permitted by the Constitution.

First, the United States argues that the Constitution's prohibition of congressional directives to state governments can be overcome where the federal interest is sufficiently important to justify state submission.  This argument contains a kernel of truth: In determining whether the Tenth Amendment limits the ability of Congress to subject state governments to generally applicable laws, the Court *has* in some cases stated that it will evaluate the strength of federal interests in light of the degree to which such laws would prevent the State from functioning as a sovereign; that is, the extent to which such generally applicable laws would impede a state government's responsibility to represent and be accountable to the citizens of the State.  See, *e. g., EEOC* v.

*Wyoming*, 460 U. S., at 242, n. 17; *Transportation Union* v. *Long Island R. Co.*, 455 U. S., at 684, n. 9; *National League of Cities* v. *Usery*, 426 U. S., at 853. The Court has more recently departed from this approach. See, *e. g.*, *South Carolina* v. *Baker*, 485 U. S., at 512–513; *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S., at 556–557. But whether or not a particularly strong federal interest enables Congress to bring state governments within the orbit of generally applicable *federal* regulation, no Member of the Court has ever suggested that such a federal interest would enable Congress to command a state government to enact *state* regulation. No matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate. The Constitution instead gives Congress the authority to regulate matters directly and to pre-empt contrary state regulation. Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents.

Second, the United States argues that the Constitution does, in some circumstances, permit federal directives to state governments. Various cases are cited for this proposition, but none support it. Some of these cases discuss the well established power of Congress to pass laws enforceable in state courts. See *Testa* v. *Katt*, 330 U. S. 386 (1947); *Palmore* v. *United States*, 411 U. S. 389, 402 (1973); see also *Second Employers' Liability Cases*, 223 U. S. 1, 57 (1912); *Claflin* v. *Houseman*, 93 U. S. 130, 136–137 (1876). These cases involve no more than an application of the Supremacy Clause's provision that federal law "shall be the supreme Law of the Land," enforceable in every State. More to the point, all involve congressional regulation of individuals, not congressional requirements that States regulate. Federal statutes enforceable in state courts do, in a sense, direct state judges to enforce them, but this sort of federal "direction" of state judges is mandated by the text of the Suprem-

acy Clause. No comparable constitutional provision authorizes Congress to command state legislatures to legislate.

Additional cases cited by the United States discuss the power of federal *courts* to order state officials to comply with federal law. See *Puerto Rico* v. *Branstad,* 483 U. S. 219, 228 (1987); *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U. S. 658, 695 (1979); *Illinois* v. *City of Milwaukee,* 406 U. S. 91, 106–108 (1972); see also *Cooper* v. *Aaron,* 358 U. S. 1, 18–19 (1958); *Brown* v. *Board of Education,* 349 U. S. 294, 300 (1955); *Ex parte Young,* 209 U. S. 123, 155–156 (1908). Again, however, the text of the Constitution plainly confers this authority on the federal courts, the "judicial Power" of which "shall extend to all Cases, in Law and Equity, arising under this Constitution, [and] the Laws of the United States . . . ; [and] to Controversies between two or more States; [and] between a State and Citizens of another State." U. S. Const., Art. III, §2. The Constitution contains no analogous grant of authority to Congress. Moreover, the Supremacy Clause makes federal law paramount over the contrary positions of state officials; the power of federal courts to enforce federal law thus presupposes some authority to order state officials to comply. See *Puerto Rico* v. *Branstad, supra,* at 227–228 (overruling *Kentucky* v. *Dennison,* 24 How. 66 (1861)).

In sum, the cases relied upon by the United States hold only that federal law is enforceable in state courts and that federal courts may in proper circumstances order state officials to comply with federal law, propositions that by no means imply any authority on the part of Congress to mandate state regulation.

Third, the United States, supported by the three sited regional compacts as *amici,* argues that the Constitution envisions a role for Congress as an arbiter of interstate disputes. The United States observes that federal courts, and this Court in particular, have frequently resolved conflicts among States. See, *e. g., Arkansas* v. *Oklahoma,* 503 U. S. 91

(1992); *Wyoming* v. *Oklahoma*, 502 U. S. 437 (1992). Many of these disputes have involved the allocation of shared resources among the States, a category perhaps broad enough to encompass the allocation of scarce disposal space for radioactive waste. See, *e. g., Colorado* v. *New Mexico*, 459 U. S. 176 (1982); *Arizona* v. *California*, 373 U. S. 546 (1963). The United States suggests that if the Court may resolve such interstate disputes, Congress can surely do the same under the Commerce Clause. The regional compacts support this argument with a series of quotations from The Federalist and other contemporaneous documents, which the compacts contend demonstrate that the Framers established a strong National Legislature for the purpose of resolving trade disputes among the States. Brief for Rocky Mountain Low-Level Radioactive Waste Compact et al. as *Amici Curiae* 17, and n. 16.

While the Framers no doubt endowed Congress with the power to regulate interstate commerce in order to avoid further instances of the interstate trade disputes that were common under the Articles of Confederation, the Framers did *not* intend that Congress should exercise that power through the mechanism of mandating state regulation. The Constitution established Congress as "a superintending authority over the reciprocal trade" among the States, The Federalist No. 42, p. 268 (C. Rossiter ed. 1961), by empowering Congress to regulate that trade directly, not by authorizing Congress to issue trade-related orders to state governments. As Madison and Hamilton explained, "a sovereignty over sovereigns, a government over governments, a legislation for communities, as contradistinguished from individuals, as it is a solecism in theory, so in practice it is subversive of the order and ends of civil polity." *Id.,* No. 20, at 138.

## B

The sited state respondents focus their attention on the process by which the Act was formulated. They correctly

observe that public officials representing the State of New York lent their support to the Act's enactment. A Deputy Commissioner of the State's Energy Office testified in favor of the Act. See Low-Level Waste Legislation: Hearings on H. R. 862, H. R. 1046, H. R. 1083, and H. R. 1267 before the Subcommittee on Energy and the Environment of the House Committee on Interior and Insular Affairs, 99th Cong., 1st Sess., 97–98, 190–199 (1985) (testimony of Charles Guinn). Senator Moynihan of New York spoke in support of the Act on the floor of the Senate. 131 Cong. Rec. 38423 (1985). Respondents note that the Act embodies a bargain among the sited and unsited States, a compromise to which New York was a willing participant and from which New York has reaped much benefit. Respondents then pose what appears at first to be a troubling question: How can a federal statute be found an unconstitutional infringement of state sovereignty when state officials consented to the statute's enactment?

The answer follows from an understanding of the fundamental purpose served by our Government's federal structure. The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: "Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Coleman* v. *Thompson*, 501 U. S. 722, 759 (1991) (BLACKMUN, J., dissenting). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory* v. *Ash-*

*croft,* 501 U. S., at 458. See The Federalist No. 51, p. 323 (C. Rossiter ed. 1961).

Where Congress exceeds its authority relative to the States, therefore, the departure from the constitutional plan cannot be ratified by the "consent" of state officials. An analogy to the separation of powers among the branches of the Federal Government clarifies this point. The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment. In *Buckley* v. *Valeo,* 424 U. S. 1, 118–137 (1976), for instance, the Court held that Congress had infringed the President's appointment power, despite the fact that the President himself had manifested his consent to the statute that caused the infringement by signing it into law. See *National League of Cities* v. *Usery,* 426 U. S., at 842, n. 12. In *INS* v. *Chadha,* 462 U. S. 919, 944–959 (1983), we held that the legislative veto violated the constitutional requirement that legislation be presented to the President, despite Presidents' approval of hundreds of statutes containing a legislative veto provision. See *id.,* at 944–945. The constitutional authority of Congress cannot be expanded by the "consent" of the governmental unit whose domain is thereby narrowed, whether that unit is the Executive Branch or the States.

State officials thus cannot consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution. Indeed, the facts of these cases raise the possibility that powerful incentives might lead both federal and state officials to view departures from the federal structure to be in their personal interests. Most citizens recognize the need for radioactive waste disposal sites, but few want sites near their homes. As a result, while it would be well within the authority of either federal or state officials to choose where the disposal sites will be, it is likely to be in the political interest of each individual official to avoid being held accountable to the voters for the choice of location. If

a federal official is faced with the alternatives of choosing a location or directing the States to do it, the official may well prefer the latter, as a means of shifting responsibility for the eventual decision. If a state official is faced with the same set of alternatives—choosing a location or having Congress direct the choice of a location—the state official may also prefer the latter, as it may permit the avoidance of personal responsibility. The interests of public officials thus may not coincide with the Constitution's intergovernmental allocation of authority. Where state officials purport to submit to the direction of Congress in this manner, federalism is hardly being advanced.

Nor does the State's prior support for the Act estop it from asserting the Act's unconstitutionality. While New York has received the benefit of the Act in the form of a few more years of access to disposal sites in other States, New York has never joined a regional radioactive waste compact. Any estoppel implications that might flow from membership in a compact, see *West Virginia ex rel. Dyer* v. *Sims*, 341 U. S. 22, 35–36 (1951) (Jackson, J., concurring), thus do not concern us here. The fact that the Act, like much federal legislation, embodies a compromise among the States does not elevate the Act (or the antecedent discussions among representatives of the States) to the status of an interstate agreement requiring Congress' approval under the Compact Clause. Cf. *Holmes* v. *Jennison*, 14 Pet. 540, 572 (1840) (plurality opinion). That a party collaborated with others in seeking legislation has never been understood to estop the party from challenging that legislation in subsequent litigation.

## V

Petitioners also contend that the Act is inconsistent with the Constitution's Guarantee Clause, which directs the United States to "guarantee to every State in this Union a Republican Form of Government." U. S. Const., Art. IV, § 4. Because we have found the take title provision of the Act

irreconcilable with the powers delegated to Congress by the Constitution and hence with the Tenth Amendment's reservation to the States of those powers not delegated to the Federal Government, we need only address the applicability of the Guarantee Clause to the Act's other two challenged provisions.

We approach the issue with some trepidation, because the Guarantee Clause has been an infrequent basis for litigation throughout our history. In most of the cases in which the Court has been asked to apply the Clause, the Court has found the claims presented to be nonjusticiable under the "political question" doctrine. See, e. g., *City of Rome* v. *United States*, 446 U. S. 156, 182, n. 17 (1980) (challenge to the preclearance requirements of the Voting Rights Act); *Baker* v. *Carr*, 369 U. S. 186, 218–229 (1962) (challenge to apportionment of state legislative districts); *Pacific States Telephone & Telegraph Co.* v. *Oregon*, 223 U. S. 118, 140–151 (1912) (challenge to initiative and referendum provisions of state constitution).

The view that the Guarantee Clause implicates only nonjusticiable political questions has its origin in *Luther* v. *Borden*, 7 How. 1 (1849), in which the Court was asked to decide, in the wake of Dorr's Rebellion, which of two rival governments was the legitimate government of Rhode Island. The Court held that "it rests with Congress," not the judiciary, "to decide what government is the established one in a State." *Id.*, at 42. Over the following century, this limited holding metamorphosed into the sweeping assertion that "[v]iolation of the great guaranty of a republican form of government in States cannot be challenged in the courts." *Colegrove* v. *Green*, 328 U. S. 549, 556 (1946) (plurality opinion).

This view has not always been accepted. In a group of cases decided before the holding of *Luther* was elevated into a general rule of nonjusticiability, the Court addressed the merits of claims founded on the Guarantee Clause without any suggestion that the claims were not justiciable. See *At-*

torney General of Michigan ex rel. Kies v. Lowrey, 199 U. S. 233, 239 (1905); Forsyth v. Hammond, 166 U. S. 506, 519 (1897); In re Duncan, 139 U. S. 449, 461–462 (1891); Minor v. Happersett, 21 Wall. 162, 175–176 (1875). See also Plessy v. Ferguson, 163 U. S. 537, 563–564 (1896) (Harlan, J., dissenting) (racial segregation "inconsistent with the guarantee given by the Constitution to each State of a republican form of government").

More recently, the Court has suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions. See Reynolds v. Sims, 377 U. S. 533, 582 (1964) ("[S]ome questions raised under the Guarantee Clause are nonjusticiable"). Contemporary commentators have likewise suggested that courts should address the merits of such claims, at least in some circumstances. See, e. g., L. Tribe, American Constitutional Law 398 (2d ed. 1988); J. Ely, Democracy and Distrust: A Theory of Judicial Review 118, n., and 122–123 (1980); W. Wiecek, The Guarantee Clause of the U. S. Constitution 287–289, 300 (1972); Merritt, 88 Colum. L. Rev., at 70–78; Bonfield, The Guarantee Clause of Article IV, Section 4: A Study in Constitutional Desuetude, 46 Minn. L. Rev. 513, 560–565 (1962).

We need not resolve this difficult question today. Even if we assume that petitioners' claim is justiciable, neither the monetary incentives provided by the Act nor the possibility that a State's waste producers may find themselves excluded from the disposal sites of another State can reasonably be said to deny any State a republican form of government. As we have seen, these two incentives represent permissible conditional exercises of Congress' authority under the Spending and Commerce Clauses respectively, in forms that have now grown commonplace. Under each, Congress offers the States a legitimate choice rather than issuing an unavoidable command. The States thereby retain the ability to set their legislative agendas; state government officials remain accountable to the local electorate. The twin threats

imposed by the first two challenged provisions of the Act—that New York may miss out on a share of federal spending or that those generating radioactive waste within New York may lose out-of-state disposal outlets—do not pose any realistic risk of altering the form or the method of functioning of New York's government. Thus even indulging the assumption that the Guarantee Clause provides a basis upon which a State or its subdivisions may sue to enjoin the enforcement of a federal statute, petitioners have not made out such a claim in these cases.

## VI

Having determined that the take title provision exceeds the powers of Congress, we must consider whether it is severable from the rest of the Act.

"The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock,* 480 U. S. 678, 684 (1987) (internal quotation marks omitted). While the Act itself contains no statement of whether its provisions are severable, "[i]n the absence of a severability clause, . . . Congress' silence is just that—silence—and does not raise a presumption against severability." *Id.,* at 686. Common sense suggests that where Congress has enacted a statutory scheme for an obvious purpose, and where Congress has included a series of provisions operating as incentives to achieve that purpose, the invalidation of one of the incentives should not ordinarily cause Congress' overall intent to be frustrated. As the Court has observed, "it is not to be presumed that the legislature was legislating for the mere sake of imposing penalties, but the penalties . . . were simply in aid of the main purpose of the statute. They may fail, and still the great body of the statute have operative force, and the force contemplated by the legislature in its

enactment." *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 396 (1894). See also *United States* v. *Jackson*, 390 U. S. 570, 585–586 (1968).

It is apparent in light of these principles that the take title provision may be severed without doing violence to the rest of the Act. The Act is still operative and it still serves Congress' objective of encouraging the States to attain local or regional self-sufficiency in the disposal of low level radioactive waste. It still includes two incentives that coax the States along this road. A State whose radioactive waste generators are unable to gain access to disposal sites in other States may encounter considerable internal pressure to provide for the disposal of waste, even without the prospect of taking title. The sited regional compacts need not accept New York's waste after the 7-year transition period expires, so any burden caused by New York's failure to secure a disposal site will not be borne by the residents of other States. The purpose of the Act is not defeated by the invalidation of the take title provision, so we may leave the remainder of the Act in force.

## VII

Some truths are so basic that, like the air around us, they are easily overlooked. Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear "formalistic" in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day. The shortage of disposal sites for radioactive waste is a pressing national problem, but a judiciary that licensed extraconstitutional

government with each issue of comparable gravity would, in the long run, be far worse.

States are not mere political subdivisions of the United States. State governments are neither regional offices nor administrative agencies of the Federal Government. The positions occupied by state officials appear nowhere on the Federal Government's most detailed organizational chart. The Constitution instead "leaves to the several States a residuary and inviolable sovereignty," The Federalist No. 39, p. 245 (C. Rossiter ed. 1961), reserved explicitly to the States by the Tenth Amendment.

Whatever the outer limits of that sovereignty may be, one thing is clear: The Federal Government may not compel the States to enact or administer a federal regulatory program. The Constitution permits both the Federal Government and the States to enact legislation regarding the disposal of low level radioactive waste. The Constitution enables the Federal Government to pre-empt state regulation contrary to federal interests, and it permits the Federal Government to hold out incentives to the States as a means of encouraging them to adopt suggested regulatory schemes. It does not, however, authorize Congress simply to direct the States to provide for the disposal of the radioactive waste generated within their borders. While there may be many constitutional methods of achieving regional self-sufficiency in radioactive waste disposal, the method Congress has chosen is not one of them. The judgment of the Court of Appeals is accordingly

*Affirmed in part and reversed in part.*

JUSTICE WHITE, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, concurring in part and dissenting in part.

The Court today affirms the constitutionality of two facets of the Low-Level Radioactive Waste Policy Amendments Act of 1985 (1985 Act), Pub. L. 99–240, 99 Stat. 1842, 42 U. S. C. § 2021b *et seq.* These provisions include the monetary in-

centives from surcharges collected by States with low-level radioactive waste storage sites and rebated by the Secretary of Energy to States in compliance with the 1985 Act's deadlines for achieving regional or in-state disposal, see §§ 2021e(d)(2)(A) and 2021e(d)(2)(B)(iv), and the "access incentives," which deny access to disposal sites for States that fail to meet certain deadlines for low-level radioactive waste disposal management, § 2021e(e)(2). The Court strikes down and severs a third component of the 1985 Act, the "take title" provision, which requires a noncomplying State to take title to or to assume liability for its low-level radioactive waste if it fails to provide for the disposal of such waste by January 1, 1996. § 2021e(d)(2)(C). The Court deems this last provision unconstitutional under principles of federalism. Because I believe the Court has mischaracterized the essential inquiry, misanalyzed the inquiry it has chosen to undertake, and undervalued the effect the seriousness of this public policy problem should have on the constitutionality of the take title provision, I can only join Parts III–A and III–B, and I respectfully dissent from the rest of its opinion and the judgment reversing in part the judgment of the Court of Appeals.

I

My disagreement with the Court's analysis begins at the basic descriptive level of how the legislation at issue in these cases came to be enacted. The Court goes some way toward setting out the bare facts, but its omissions cast the statutory context of the take title provision in the wrong light. To read the Court's version of eve...s, see *ante*, at 150–151, one would think that Congress was the sole proponent of a solution to the Nation's low-level radioactive waste problem. Not so. The Low-Level Radioactive Waste Policy Act of 1980 (1980 Act), Pub. L. 96–573, 94 Stat. 3347, and its amendatory 1985 Act, resulted from the efforts of state leaders to achieve a state-based set of remedies to the waste problem. They sought not federal pre-emption or intervention, but

rather congressional sanction of interstate compromises they had reached.

The two signal events in 1979 that precipitated movement toward legislation were the temporary closing of the Nevada disposal site in July 1979, after several serious transportation-related incidents, and the temporary shutting of the Washington disposal site because of similar transportation and packaging problems in October 1979. At that time the facility in Barnwell, South Carolina, received approximately three-quarters of the Nation's low-level radioactive waste, and the Governor ordered a 50 percent reduction in the amount his State's plant would accept for disposal. National Governors' Association Task Force on Low-Level Radioactive Waste Disposal, Low-Level Waste: A Program for Action 3 (Nov. 1980) (lodged with the Clerk of this Court) (hereinafter A Program for Action). The Governor of Washington threatened to shut down the Hanford, Washington, facility entirely by 1982 unless "some meaningful progress occurs toward" development of regional solutions to the waste disposal problem. *Id.*, at 4, n. Only three sites existed in the country for the disposal of low-level radioactive waste, and the "sited" States confronted the undesirable alternatives either of continuing to be the dumping grounds for the entire Nation's low-level waste or of eliminating or reducing in a constitutional manner the amount of waste accepted for disposal.

The imminence of a crisis in low-level radioactive waste management cannot be overstated. In December 1979, the National Governors' Association convened an eight-member task force to coordinate policy proposals on behalf of the States. See Status of Interstate Compacts for the Disposal of Low-Level Radioactive Waste: Hearing before the Senate Committee on the Judiciary, 98th Cong., 1st Sess., 8 (1983). In May 1980, the State Planning Council on Radioactive Waste Management submitted the following unanimous recommendation to President Carter:

"The national policy of the United States on low-level radioactive waste shall be that every State is responsible for the disposal of the low-level radioactive waste generated by nondefense related activities within its boundaries and that States are authorized to enter into interstate compacts, as necessary, for the purpose of carrying out this responsibility." 126 Cong. Rec. 20135 (1980).

This recommendation was adopted by the National Governors' Association a few months later. See A Program for Action 6–7; H. R. Rep. No. 99–314, pt. 2, p. 18 (1985). The Governors recognized that the Federal Government could assert its preeminence in achieving a solution to this problem, but requested instead that Congress oversee state-developed regional solutions. Accordingly, the Governors' Task Force urged that "each state should accept primary responsibility for the safe disposal of low-level radioactive waste generated within its borders" and that "the states should pursue a regional approach to the low-level waste disposal problem." A Program for Action 6.

The Governors went further, however, in recommending that "Congress should authorize the states to enter into interstate compacts to establish regional disposal sites" and that "[s]uch authorization should include the power to exclude waste generated outside the region from the regional disposal site." *Id.*, at 7. The Governors had an obvious incentive in urging Congress not to add more coercive measures to the legislation should the States fail to comply, but they nevertheless anticipated that Congress might eventually have to take stronger steps to ensure compliance with long-range planning deadlines for low-level radioactive waste management. Accordingly, the Governors' Task Force

"recommend[ed] that Congress defer consideration of sanctions to compel the establishment of new disposal sites until at least two years after the enactment of com-

pact consent legislation. States are already confronting the diminishing capacity of present sites and an unequivocal political warning from those states' Governors. If at the end of the two-year period states have not responded effectively, or if problems still exist, stronger federal action may be necessary. But until that time, Congress should confine its role to removing obstacles and allow the states a reasonable chance to solve the problem themselves." *Id.*, at 8–9.

Such concerns would have been mooted had Congress enacted a "federal" solution, which the Senate considered in July 1980. See S. 2189, 96th Cong., 2d Sess. (1980); S. Rep. No. 96-548 (1980) (detailing legislation calling for federal study, oversight, and management of radioactive waste). This "federal" solution, however, was opposed by one of the sited State's Senators, who introduced an amendment to adopt and implement the recommendations of the State Planning Council on Radioactive Waste Management. See 126 Cong. Rec. 20136 (1980) (statement of Sen. Thurmond). The "state-based" solution carried the day, and as enacted, the 1980 Act announced the "policy of the Federal Government that . . . each State is responsible for providing for the availability of capacity either within or outside the State for the disposal of low-level radioactive waste generated within its borders." Pub. L. 96-573, § 4(a)(1), 94 Stat. 3348. The 1980 Act further authorized States to "enter into such compacts as may be necessary to provide for the establishment and operation of regional disposal facilities for low-level radioactive waste," § 4(a)(2)(A), compacts to which Congress would have to give its consent. § 4(a)(2)(B). The 1980 Act also provided that, beginning on January 1, 1986, an approved compact could reserve access to its disposal facilities for those States which had joined that particular regional compact. *Ibid.*

As well described by one of the *amici*, the attempts by States to enter into compacts and to gain congressional ap-

proval sparked a new round of political squabbling between elected officials from unsited States, who generally opposed ratification of the compacts that were being formed, and their counterparts from the sited States, who insisted that the promises made in the 1980 Act be honored. See Brief for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae* 12–14. In its effort to keep the States at the forefront of the policy amendment process, the National Governors' Association organized more than a dozen meetings to achieve a state consensus. See H. Brown, The Low-Level Waste Handbook: A User's Guide to the Low-Level Radioactive Waste Policy Amendments Act of 1985, p. iv (Nov. 1986) (describing "the states' desire to influence any revisions of the 1980 Act").

These discussions were not merely academic. The sited States grew increasingly and justifiably frustrated by the seeming inaction of unsited States in meeting the projected actions called for in the 1980 Act. Thus, as the end of 1985 approached, the sited States viewed the January 1, 1986, deadline established in the 1980 Act as a "drop-dead" date, on which the regional compacts could begin excluding the entry of out-of-region waste. See 131 Cong. Rec. 35203 (1985). Since by this time the three disposal facilities operating in 1980 were still the only such plants accepting low-level radioactive waste, the unsited States perceived a very serious danger if the three existing facilities actually carried out their threat to restrict access to the waste generated solely within their respective compact regions.

A movement thus arose to achieve a compromise between the sited and the unsited States, in which the sited States agreed to continue accepting waste in exchange for the imposition of stronger measures to guarantee compliance with the unsited States' assurances that they would develop alternative disposal facilities. As Representative Derrick explained, the compromise 1985 legislation "gives nonsited

States more time to develop disposal sites, but also establishes a very firm timetable and sanctions for failure to live up [to] the agreement." *Id.*, at 35207. Representative Markey added that "[t]his compromise became the basis for our amendments to the Low-Level Radioactive Waste Policy Act of 1980. In the process of drafting such amendments, various concessions have been made by all sides in an effort to arrive at a bill which all parties could accept." *Id.*, at 35205. The bill that in large measure became the 1985 Act "represent[ed] the diligent negotiating undertaken by" the National Governors' Association and "embodied" the "fundamentals of their settlement." *Id.*, at 35204 (statement of Rep. Udall). In sum, the 1985 Act was very much the product of cooperative federalism, in which the States bargained among themselves to achieve compromises for Congress to sanction.

There is no need to resummarize the essentials of the 1985 legislation, which the Court does *ante*, at 151–154. It does, however, seem critical to emphasize what is accurately described in one *amicus* brief as the assumption by Congress of "the role of arbiter of disputes among the several States." Brief for Rocky Mountain Low-Level Radioactive Waste Compact et al. as *Amici Curiae* 9. Unlike legislation that directs action from the Federal Government to the States, the 1980 and 1985 Acts reflected hard-fought agreements among States as refereed by Congress. The distinction is key, and the Court's failure properly to characterize this legislation ultimately affects its analysis of the take title provision's constitutionality.

## II

To justify its holding that the take title provision contravenes the Constitution, the Court posits that "[i]n this provision, Congress has crossed the line distinguishing encouragement from coercion." *Ante*, at 175. Without attempting to understand properly the take title provision's place in the

interstate bargaining process, the Court isolates the measure analytically and proceeds to dissect it in a syllogistic fashion. The Court candidly begins with an argument respondents do *not* make: that "the Constitution would not permit Congress simply to transfer radioactive waste from generators to state governments." *Ibid.* "Such a forced transfer," it continues, "standing alone, would in principle be no different than a congressionally compelled subsidy from state governments to radioactive waste producers." *Ibid.* Since this is *not* an argument respondents make, one naturally wonders why the Court builds its analysis that the take title provision is unconstitutional around this opening premise. But having carefully built its straw man, the Court proceeds impressively to knock him down. "As we have seen," the Court teaches, "the Constitution does not empower Congress to subject state governments to this type of instruction." *Ante*, at 176.

Curiously absent from the Court's analysis is any effort to place the take title provision within the overall context of the legislation. As the discussion in Part I of this opinion suggests, the 1980 and 1985 statutes were enacted against a backdrop of national concern over the availability of additional low-level radioactive waste disposal facilities. Congress could have pre-empted the field by directly regulating the disposal of this waste pursuant to its powers under the Commerce and Spending Clauses, but instead it *unanimously* assented to the States' request for congressional ratification of agreements to which they had acceded. See 131 Cong. Rec. 35252 (1985); *id.*, at 38425. As the floor statements of Members of Congress reveal, see *supra*, at 193–194, the States wished to take the lead in achieving a solution to this problem and agreed among themselves to the various incentives and penalties implemented by Congress to ensure

adherence to the various deadlines and goals.[1] The chief executives of the States proposed this approach, and I am unmoved by the Court's vehemence in taking away Congress' authority to sanction a recalcitrant unsited State now that New York has reaped the benefits of the sited States' concessions.

### A

In my view, New York's actions subsequent to enactment of the 1980 and 1985 Acts fairly indicate its approval of the interstate agreement process embodied in those laws within the meaning of Art. I, § 10, cl. 3, of the Constitution, which provides that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State." First, the States—including New York—worked through their Governors to petition Congress for the 1980 and 1985 Acts. As I have attempted to demonstrate, these statutes are best understood as the products of collective state action, rather than as impositions placed on States by the Federal Government. Second, New York acted in compliance with the requisites of both statutes in key respects, thus signifying its assent to the agreement achieved among the States as codified in these laws. After enactment of the 1980 Act and pursuant to its provision in § 4(a)(2), 94 Stat. 3348, New York entered into compact negotiations with several other northeastern States before withdrawing from them to "go it alone." Indeed, in 1985, as the January 1, 1986, deadline crisis approached and Congress considered the 1985 legislation that is the subject of this lawsuit, the Deputy Commissioner for Policy and Planning of the New

---

[1] As Senator McClure pointed out: "[T]he actions taken in the Committee on Energy and Natural Resources met the objections and the objectives of the States point by point; and I want to underscore what the Senator from Louisiana has indicated—that it is important that we have real milestones. It is important to note that the discussions between staffs and principals have produced a[n] agreement that does have some real teeth in it at some points." 131 Cong. Rec. 38415 (1985).

York State Energy Office testified before Congress that "New York State supports the efforts of Mr. Udall and the members of this Subcommittee to resolve the current impasse over Congressional consent to the proposed LLRW compacts and provide interim access for states and regions without sites. *New York State has been participating with the National Governors' Association and the other large states and compact commissions in an effort to further refine the recommended approach in HR 1083 and reach a consensus between all groups.*" See Low-Level Waste Legislation: Hearings on H. R. 862, H. R. 1046, H. R. 1083, and H. R. 1267 before the Subcommittee on Energy and the Environment of the House Committee on Interior and Insular Affairs, 99th Cong., 1st Sess., 197 (1985) (testimony of Charles Guinn) (emphasis added).

Based on the assumption that "other states will [not] continue indefinitely to provide access to facilities adequate for the permanent disposal of low-level radioactive waste generated in New York," 1986 N. Y. Laws, ch. 673, § 2, the state legislature enacted a law providing for a waste disposal facility to be sited in the State. *Ibid.* This measure comported with the 1985 Act's proviso that States which did not join a regional compact by July 1, 1986, would have to establish an in-state waste disposal facility. See 42 U. S. C. § 2021e (e)(1)(A). New York also complied with another provision of the 1985 Act, § 2021e(e)(1)(B), which provided that by January 1, 1988, each compact or independent State would identify a facility location and develop a siting plan, or contract with a sited compact for access to that region's facility. By 1988, New York had identified five potential sites in Cortland and Allegany Counties, but public opposition there caused the State to reconsider where to locate its waste disposal facility. See Office of Environmental Restoration and Waste Management, U. S. Dept. of Energy, Report to Congress in Response to Public Law 99–240: 1990 Annual Report on Low-Level Radioactive Waste Management Progress 32–35

(1991) (lodged with the Clerk of this Court). As it was undertaking these initial steps to honor the interstate compromise embodied in the 1985 Act, New York continued to take full advantage of the import concession made by the sited States, by exporting its low-level radioactive waste for the full 7-year extension period provided in the 1985 Act. By gaining these benefits and complying with certain of the 1985 Act's deadlines, therefore, New York fairly evidenced its acceptance of the federal-state arrangement—including the take title provision.

Although unlike the 42 States that compose the nine existing and approved regional compacts, see Brief for United States 10, n. 19, New York has never formalized its assent to the 1980 and 1985 statutes, our cases support the view that New York's actions signify assent to a constitutional interstate "agreement" for purposes of Art. I, § 10, cl. 3. In *Holmes* v. *Jennison,* 14 Pet. 540 (1840), Chief Justice Taney stated that "[t]he word 'agreement,' does not necessarily import any direct and express stipulation; nor is it necessary that it should be in writing. If there is a verbal understanding to which both parties have assented, *and upon which both are acting,* it is an 'agreement.' And the use of all of these terms, 'treaty,' 'agreement,' 'compact,' show that it was the intention of the framers of the Constitution to use the broadest and most comprehensive terms; . . . and we shall fail to execute that evident intention, unless we give to the word 'agreement' its most extended signification; and so apply it as to prohibit every agreement, written or verbal, formal or informal, positive or implied, by the mutual understanding of the parties." *Id.,* at 572. (emphasis added). In my view, New York acted in a manner to signify its assent to the 1985 Act's take title provision as part of the elaborate compromise reached among the States.

The State should be estopped from asserting the unconstitutionality of a provision that seeks merely to ensure that, after deriving substantial advantages from the 1985 Act,

New York in fact must live up to its bargain by establishing an in-state low-level radioactive waste facility or assuming liability for its failure to act. Cf. *West Virginia ex rel. Dyer* v. *Sims*, 341 U. S. 22, 35–36 (1951), Jackson, J., concurring: "West Virginia officials induced sister States to contract with her and Congress to consent to the Compact. She now attempts to read herself out of this interstate Compact . . . . Estoppel is not often to be invoked against a government. But West Virginia assumed a contractual obligation with equals by permission of another government that is sovereign in the field. *After Congress and sister States had been induced to alter their positions and bind themselves to terms of a covenant,* West Virginia should be estopped from repudiating her act." (Emphasis added.)

B

Even were New York not to be estopped from challenging the take title provision's constitutionality, I am convinced that, seen as a term of an agreement entered into between the several States, this measure proves to be less constitutionally odious than the Court opines. First, the practical effect of New York's position is that because it is unwilling to honor its obligations to provide in-state storage facilities for its low-level radioactive waste, *other* States with such plants *must accept* New York's waste, whether they wish to or not. Otherwise, the many economically and socially beneficial producers of such waste in the State would have to cease their operations. The Court's refusal to force New York to accept responsibility for its own problem inevitably means that some other State's sovereignty will be impinged by it being forced, for public health reasons, to accept New York's low-level radioactive waste. I do not understand the principle of federalism to impede the National Government from acting as referee among the States to prohibit one from bullying another.

Moreover, it is utterly reasonable that, in crafting a delicate compromise between the three overburdened States that provided low-level radioactive waste disposal facilities and the rest of the States, Congress would have to ratify some punitive measure as the ultimate sanction for noncompliance. The take title provision, though surely onerous, does *not* take effect if the generator of the waste does not request such action, or if the State lives up to its bargain of providing a waste disposal facility either within the State or in another State pursuant to a regional compact arrangement or a separate contract. See 42 U. S. C. § 2021e(d)(2)(C).

Finally, to say, as the Court does, that the incursion on state sovereignty "cannot be ratified by the 'consent' of state officials," *ante*, at 182, is flatly wrong. In a case involving a congressional ratification statute to an interstate compact, the Court upheld a provision that Tennessee and Missouri had waived their immunity from suit. Over their objection, the Court held that "[t]he States who are parties to the compact by accepting it *and acting under it assume the conditions* that Congress under the Constitution attached." *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275, 281–282 (1959) (emphasis added). In so holding, the Court determined that a State may be found to have waived a fundamental aspect of its sovereignty—the right to be immune from suit—in the formation of an interstate compact even when in subsequent litigation it expressly denied its waiver. I fail to understand the reasoning behind the Court's selective distinctions among the various aspects of sovereignty that may and may not be waived and do not believe these distinctions will survive close analysis in future cases. Hard public policy choices sometimes require strong measures, and the Court's holding, while not irremediable, essentially misunderstands that the 1985 take title provision was part of a complex interstate agreement about which New York should not now be permitted to complain.

## III

The Court announces that it has no occasion to revisit such decisions as *Gregory* v. *Ashcroft*, 501 U. S. 452 (1991); *South Carolina* v. *Baker*, 485 U. S. 505 (1988); *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985); *EEOC* v. *Wyoming*, 460 U. S. 226 (1983); and *National League of Cities* v. *Usery*, 426 U. S. 833 (1976); see *ante*, at 160, because "this is not a case in which Congress has subjected a State to the same legislation applicable to private parties." *Ibid.* Although this statement sends the welcome signal that the Court does not intend to cut a wide swath through our recent Tenth Amendment precedents, it nevertheless is unpersuasive. I have several difficulties with the Court's analysis in this respect: It builds its rule around an insupportable and illogical distinction in the types of alleged incursions on state sovereignty; it derives its rule from cases that do not support its analysis; it fails to apply the appropriate tests from the cases on which it purports to base its rule; and it omits any discussion of the most recent and pertinent test for determining the take title provision's constitutionality.

The Court's distinction between a federal statute's regulation of States and private parties for general purposes, as opposed to a regulation solely on the activities of States, is unsupported by our recent Tenth Amendment cases. In no case has the Court rested its holding on such a distinction. Moreover, the Court makes no effort to explain why this purported distinction should affect the analysis of Congress' power under general principles of federalism and the Tenth Amendment. The distinction, facilely thrown out, is not based on any defensible theory. Certainly one would be hard pressed to read the spirited exchanges between the Court and dissenting Justices in *National League of Cities, supra,* and in *Garcia* v. *San Antonio Metropolitan Transit Authority, supra,* as having been based on the distinction now drawn by the Court. An incursion on state sovereignty

hardly seems more constitutionally acceptable if the federal statute that "commands" specific action also applies to private parties. The alleged diminution in state authority over its own affairs is not any less because the federal mandate restricts the activities of private parties.

Even were such a distinction to be logically sound, the Court's "anticommandeering" principle cannot persuasively be read as springing from the two cases cited for the proposition, *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 288 (1981), and *FERC* v. *Mississippi*, 456 U. S. 742, 761–762 (1982). The Court purports to draw support for its rule against Congress "commandeer-[ing]" state legislative processes from a solitary statement in dictum in *Hodel*. See *ante*, at 161: "As an initial matter, Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program'" (quoting *Hodel, supra*, at 288). That statement was not necessary to the decision in *Hodel*, which involved the question whether the Tenth Amendment interfered with Congress' authority to pre-empt a field of activity that could also be subject to state regulation and not whether a federal statute could dictate certain actions by States; the language about "commandeer-[ing]" States was classic dicta. In holding that a federal statute regulating the activities of private coal mine operators was constitutional, the Court observed that "[i]t would . . . be a radical departure from long-established precedent for this Court to hold that the Tenth Amendment prohibits Congress from displacing state police power laws regulating private activity." 452 U. S., at 292.

The Court also claims support for its rule from our decision in *FERC*, and quotes a passage from that case in which we stated that "'this Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations.'" *Ante*, at 161 (quoting 456 U. S., at

761–762). In so reciting, the Court extracts from the relevant passage in a manner that subtly alters the Court's meaning. In full, the passage reads: "*While* this Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations, cf. *EPA* v. *Brown,* 431 U. S. 99 (1977), *there are instances where the Court has upheld federal statutory structures that in effect directed state decisionmakers to take or to refrain from taking certain actions.*" *Ibid.* (citing *Fry* v. *United States,* 421 U. S. 542 (1975) (emphasis added)).[2] The phrase highlighted by the Court merely means that we have not had the occasion to address whether Congress may "command" the States to enact a certain law, and as I have argued in Parts I and II of this opinion, these cases do not raise that issue. Moreover, it should go without saying that the *absence* of any on-point precedent from this Court has no bearing on the question whether Congress has properly exercised its constitutional authority under Article I. Silence by this Court on a subject is not authority for anything.

The Court can scarcely rest on a distinction between federal laws of general applicability and those ostensibly directed solely at the activities of States, therefore, when the decisions from which it derives the rule not only made no such distinction, but validated federal statutes that constricted state sovereignty in ways greater than or similar to

---

[2] It is true that under the majority's approach, *Fry* is distinguishable because it involved a statute generally applicable to both state governments and private parties. The law at issue in that case was the Economic Stabilization Act of 1970, which imposed wage and salary limitations on private and state workers alike. In *Fry,* the Court upheld this statute's application to the States over a Tenth Amendment challenge. In my view, *Fry* perfectly captures the weakness of the majority's distinction, because the law upheld in that case involved a far more pervasive intrusion on state sovereignty—the authority of state governments to pay salaries and wages to its employees below the federal minimum—than the take title provision at issue here.

the take title provision at issue in these cases. As *Fry*, *Hodel*, and *FERC* make clear, our precedents prior to *Garcia* upheld provisions in federal statutes that directed States to undertake certain actions. "[I]t cannot be constitutionally determinative that the federal regulation is likely to move the States to act in a given way," we stated in *FERC*, "or even to 'coerc[e] the States' into assuming a regulatory role by affecting their 'freedom to make decisions in areas of "integral governmental functions."'" 456 U. S., at 766. I thus am unconvinced that either *Hodel* or *FERC* supports the rule announced by the Court.

And if those cases do stand for the proposition that in certain circumstances Congress may not dictate that the States take specific actions, it would seem appropriate to apply the test stated in *FERC* for determining those circumstances. The crucial threshold inquiry in that case was whether the subject matter was pre-emptible by Congress. See 456 U. S., at 765. "If Congress can require a state administrative body to consider proposed regulations as a condition to its continued involvement *in a pre-emptible field*—and we hold today that it can—there is nothing unconstitutional about Congress' requiring certain procedural minima as that body goes about undertaking its tasks." *Id.*, at 771 (emphasis added). The *FERC* Court went on to explain that if Congress is legislating in a pre-emptible field—as the Court concedes it was doing here, see *ante*, at 173–174—the proper test before our decision in *Garcia* was to assess whether the alleged intrusions on state sovereignty "do not threaten the States' 'separate and independent existence,' *Lane County* v. *Oregon*, 7 Wall. 71, 76 (1869); *Coyle* v. *Smith*, 221 U. S. 559, 580 (1911), and do not impair the ability of the States 'to function effectively in a federal system.' *Fry* v. *United States*, 421 U. S., at 547, n. 7; *National League of Cities* v. *Usery*, 426 U. S., at 852." *FERC, supra*, at 765–766. On

neither score does the take title provision raise constitutional problems. It certainly does not threaten New York's independent existence nor impair its ability to function effectively in the system, all the more so since the provision was enacted pursuant to compromises reached among state leaders and then ratified by Congress.

It is clear, therefore, that even under the precedents selectively chosen by the Court, its analysis of the take title provision's constitutionality in these cases falls far short of being persuasive. I would also submit, in this connection, that the Court's attempt to carve out a doctrinal distinction for statutes that purport solely to regulate state activities is especially unpersuasive after *Garcia.* It is true that in that case we considered whether a federal statute of general applicability—the Fair Labor Standards Act—applied to state transportation entities but our most recent statements have explained the appropriate analysis in a more general manner. Just last Term, for instance, JUSTICE O'CONNOR wrote for the Court that "[w]e are constrained in our ability to consider the limits that the state-federal balance places on Congress' powers under the Commerce Clause. See *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528 (1985) (declining to review limitations placed on Congress' Commerce Clause powers by our federal system)." *Gregory* v. *Ashcroft,* 501 U. S., at 464. Indeed, her opinion went on to state that "this Court in *Garcia* has left primarily to the *political process* the protection of the States against intrusive exercises of Congress' Commerce Clause powers." *Ibid.* (emphasis added).

Rather than seek guidance from *FERC* and *Hodel,* therefore, the more appropriate analysis should flow from *Garcia,* even if these cases do not involve a congressional law generally applicable to both States and private parties. In *Garcia,* we stated the proper inquiry: "[W]e are convinced that

the fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the 'States as States' is one of process rather than one of result. Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a 'sacred province of state autonomy.'" 469 U. S., at 554 (quoting *EEOC* v. *Wyoming*, 460 U. S., at 236). Where it addresses this aspect of respondents' argument, see *ante*, at 180–183, the Court tacitly concedes that a failing of the political process cannot be shown in these cases because it refuses to rebut the unassailable arguments that the States were well able to look after themselves in the legislative process that culminated in the 1985 Act's passage. Indeed, New York acknowledges that its "congressional delegation participated in the drafting and enactment of both the 1980 and the 1985 Acts." Pet. for Cert. in No. 91–543, p. 7. The Court rejects this process-based argument by resorting to generalities and platitudes about the purpose of federalism being to protect individual rights.

Ultimately, I suppose, the entire structure of our federal constitutional government can be traced to an interest in establishing checks and balances to prevent the exercise of tyranny against individuals. But these fears seem extremely far distant to me in a situation such as this. We face a crisis of national proportions in the disposal of low-level radioactive waste, and Congress has acceded to the wishes of the States by permitting local decisionmaking rather than imposing a solution from Washington. New York itself participated and supported passage of this legislation at both the gubernatorial and federal representative levels, and then enacted state laws specifically to comply with the deadlines and timetables agreed upon by the States in the 1985 Act. For

me, the Court's civics lecture has a decidedly hollow ring at a time when action, rather than rhetoric, is needed to solve a national problem.[3]

---

[3] With selective quotations from the era in which the Constitution was adopted, the majority attempts to bolster its holding that the take title provision is tantamount to federal "commandeering" of the States. In view of the many Tenth Amendment cases decided over the past two decades in which resort to the kind of historical analysis generated in the majority opinion was not deemed necessary, I do not read the majority's many invocations of history to be anything other than elaborate window dressing. Certainly nowhere does the majority announce that its rule is compelled by an understanding of what the Framers may have thought about statutes of the type at issue here. Moreover, I would observe that, while its quotations add a certain flavor to the opinion, the majority's historical analysis has a distinctly wooden quality. One would not know from reading the majority's account, for instance, that the nature of federal-state relations changed fundamentally after the Civil War. That conflict produced in its wake a tremendous expansion in the scope of the Federal Government's law-making authority, so much so that the persons who helped to found the Republic would scarcely have recognized the many added roles the National Government assumed for itself. Moreover, the majority fails to mention the New Deal era, in which the Court recognized the enormous growth in Congress' power under the Commerce Clause. See generally F. Frankfurter & J. Landis, The Business of the Supreme Court 56–59 (1927); H. Hyman, A More Perfect Union: The Impact of the Civil War and Reconstruction on the Constitution (1973); Corwin, The Passing of Dual Federalism, 36 Va. L. Rev. 1 (1950); Wiecek, The Reconstruction of Federal Judicial Power, 1863–1875, 13 Am. J. Legal Hist. 333 (1969); Scheiber, State Law and "Industrial Policy" in American Development, 1790–1987, 75 Calif. L. Rev. 415 (1987); Ackerman, Constitutional Politics/Constitutional Law, 99 Yale L. J. 453 (1989). While I believe we should not be blind to history, neither should we read it so selectively as to restrict the proper scope of Congress' powers under Article I, especially when the history not mentioned by the majority fully supports a more expansive understanding of the legislature's authority than may have existed in the late 18th century.

Given the scanty textual support for the majority's position, it would be far more sensible to defer to a coordinate branch of government in its decision to devise a solution to a national problem of this kind. Certainly in other contexts, principles of federalism have not insulated States from mandates by the National Government. The Court has upheld congres-

## IV

Though I disagree with the Court's conclusion that the take title provision is unconstitutional, I do not read its opinion to preclude Congress from adopting a similar measure through its powers under the Spending or Commerce Clauses. The Court makes clear that its objection is to the alleged "commandeer[ing]" quality of the take title provision. See *ante*, at 175. As its discussion of the surcharge and rebate incentives reveals, see *ante*, at 171–172, the spending power offers a means of enacting a take title provision under the Court's standards. Congress could, in other words, condition the payment of funds on the State's willingness to take title if it has not already provided a waste disposal facility. Under the scheme upheld in these cases, for example, moneys collected in the surcharge provision might be withheld or disbursed depending on a State's willingness to take title to or otherwise accept responsibility for the low-level radioactive waste generated in state after the statutory deadline for establishing its own waste disposal facility has passed. See *ibid.; South Dakota* v. *Dole,* 483 U. S. 203, 208–209 (1987); *Massachusetts* v. *United States,* 435 U. S. 444, 461 (1978).

Similarly, should a State fail to establish a waste disposal facility by the appointed deadline (under the statute as presently drafted, January 1, 1996, §2021e(d)(2)(C)), Congress has the power pursuant to the Commerce Clause to regulate directly the producers of the waste. See *ante*, at 174. Thus, as I read it, Congress could amend the statute to say that if a State fails to meet the January 1, 1996, deadline for

sional statutes that impose clear directives on state officials, including those enacted pursuant to the Extradition Clause, see, *e. g., Puerto Rico* v. *Branstad,* 483 U. S. 219, 227–228 (1987), the post-Civil War Amendments, see, *e. g., South Carolina* v. *Katzenbach,* 383 U. S. 301, 319–320, 334–335 (1966), as well as congressional statutes that require state courts to hear certain actions, see, *e. g., Testa* v. *Katt,* 330 U. S. 386, 392–394 (1947).

achieving a means of waste disposal, and has not taken title to the waste, no low-level radioactive waste may be shipped out of the State of New York. See, *e. g., Hodel,* 452 U. S., at 288. As the legislative history of the 1980 and 1985 Acts indicates, faced with the choice of federal pre-emptive regulation and self-regulation pursuant to interstate agreement with congressional consent and ratification, the States decisively chose the latter. This background suggests that the threat of federal pre-emption may suffice to induce States to accept responsibility for failing to meet critical time deadlines for solving their low-level radioactive waste disposal problems, especially if that federal intervention also would strip state and local authorities of any input in locating sites for low-level radioactive waste disposal facilities. And should Congress amend the statute to meet the Court's objection and a State refuse to act, the National Legislature will have ensured at least a federal solution to the waste management problem.

Finally, our precedents leave open the possibility that Congress may create federal rights of action in the generators of low-level radioactive waste against persons acting under color of state law for their failure to meet certain functions designated in federal-state programs. Thus, we have upheld 42 U. S. C. § 1983 suits to enforce certain rights created by statutes enacted pursuant to the Spending Clause, see, *e. g., Wilder* v. *Virginia Hospital Assn.,* 496 U. S. 498 (1990); *Wright* v. *Roanoke Redevelopment and Housing Authority,* 479 U. S. 418 (1987), although Congress must be cautious in spelling out the federal right clearly and distinctly, see, *e. g., Suter* v. *Artist M.,* 503 U. S. 347 (1992) (not permitting a § 1983 suit under a Spending Clause statute when the ostensible federal right created was too vague and amorphous). In addition to compensating injured parties for the State's failure to act, the exposure to liability established by such suits also potentially serves as an inducement to compliance with the program mandate.

## V

The ultimate irony of the decision today is that in its formalistically rigid obeisance to "federalism," the Court gives Congress fewer incentives to defer to the wishes of state officials in achieving local solutions to local problems. This legislation was a classic example of Congress acting as arbiter among the States in their attempts to accept responsibility for managing a problem of grave import. The States urged the National Legislature not to impose from Washington a solution to the country's low-level radioactive waste management problems. Instead, they sought a reasonable level of local and regional autonomy consistent with Art. I, § 10, cl. 3, of the Constitution. By invalidating the measure designed to ensure compliance for recalcitrant States, such as New York, the Court upsets the delicate compromise achieved among the States and forces Congress to erect several additional formalistic hurdles to clear before achieving exactly the same objective. Because the Court's justifications for undertaking this step are unpersuasive to me, I respectfully dissent.

JUSTICE STEVENS, concurring in part and dissenting in part.

Under the Articles of Confederation, the Federal Government had the power to issue commands to the States. See Arts. VIII, IX. Because that indirect exercise of federal power proved ineffective, the Framers of the Constitution empowered the Federal Government to exercise legislative authority directly over individuals within the States, even though that direct authority constituted a greater intrusion on state sovereignty. Nothing in that history suggests that the Federal Government may not also impose its will upon the several States as it did under the Articles. The Constitution enhanced, rather than diminished, the power of the Federal Government.

The notion that Congress does not have the power to issue "a simple command to state governments to implement legislation enacted by Congress," *ante,* at 176, is incorrect and unsound. There is no such limitation in the Constitution. The Tenth Amendment[1] surely does not impose any limit on Congress' exercise of the powers delegated to it by Article I.[2] Nor does the structure of the constitutional order or the values of federalism mandate such a formal rule. To the contrary, the Federal Government directs state governments in many realms. The Government regulates state-operated railroads, state school systems, state prisons, state elections, and a host of other state functions. Similarly, there can be no doubt that, in time of war, Congress could either draft soldiers itself or command the States to supply their quotas of troops. I see no reason why Congress may not also command the States to enforce federal water and air quality standards or federal standards for the disposition of low-level radioactive wastes.

The Constitution gives this Court the power to resolve controversies between the States. Long before Congress

---

[1] The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

[2] In *United States* v. *Darby,* 312 U. S. 100 (1941), we explained:

"The amendment states but a truism that all is retained which has not been surrendered. There is nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments as it had been established by the Constitution before the amendment or that its purpose was other than to allay fears that the new national government might seek to exercise powers not granted, and that the states might not be able to exercise fully their reserved powers. See e. g., II Elliot's Debates, 123, 131, III *id.* 450, 464, 600; IV *id.* 140, 149; I Annals of Congress, 432, 761, 767–768; Story, Commentaries on the Constitution, §§ 1907–1908.

"From the beginning and for many years the amendment has been construed as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." *Id.,* at 124; see also *ante,* at 155–157.

enacted pollution-control legislation, this Court crafted a body of "'interstate common law,'" *Illinois* v. *City of Milwaukee*, 406 U. S. 91, 106 (1972), to govern disputes between States involving interstate waters. See *Arkansas* v. *Oklahoma*, 503 U. S. 91, 98–99 (1992). In such contexts, we have not hesitated to direct States to undertake specific actions. For example, we have "impose[d] on States an affirmative duty to take reasonable steps to conserve and augment the water supply of an interstate stream." *Colorado* v. *New Mexico*, 459 U. S. 176, 185 (1982) (citing *Wyoming* v. *Colorado*, 259 U. S. 419 (1922)). Thus, we unquestionably have the power to command an upstream State that is polluting the waters of a downstream State to adopt appropriate regulations to implement a federal statutory command.

With respect to the problem presented by the cases at hand, if litigation should develop between States that have joined a compact, we would surely have the power to grant relief in the form of specific enforcement of the take title provision.[3] Indeed, even if the statute had never been passed, if one State's radioactive waste created a nuisance that harmed its neighbors, it seems clear that we would have had the power

---

[3] Even if § 2021e(d)(2)(C) is "invalidated" insofar as it applies to the State of New York, it remains enforceable against the 44 States that have joined interstate compacts approved by Congress because the compacting States have, in their agreements, embraced that provision and given it independent effect. Congress' consent to the compacts was "granted subject to the provisions of the [Act] . . . and only for so long as the [entities] established in the compact comply with all the provisions of [the] Act." Appalachian States Low-Level Radioactive Waste Compact Consent Act, Pub. L. 100–319, 102 Stat. 471. Thus the compacts incorporated the provisions of the Act, including the take title provision. These compacts, the product of voluntary interstate cooperation, unquestionably survive the "invalidation" of § 2021e(d)(2)(C) as it applies to New York. Congress did not "direc[t]" the States to enter into these compacts and the decision of each compacting State to enter into a compact was not influenced by the existence of the take title provision: Whether a State went its own way or joined a compact, it was still subject to the take title provision.

to command the offending State to take remedial action. Cf. *Illinois* v. *City of Milwaukee, supra.* If this Court has such authority, surely Congress has similar authority.

For these reasons, as well as those set forth by JUSTICE WHITE, I respectfully dissent.