**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

────────────

**No. 15-1240**

────────────

MONTGOMERY COUNTY, MARYLAND,

        Petitioner,

CITY OF BURLINGAME, CALIFORNIA; TOWN OF APPLE VALLEY, CALIFORNIA,

        Intervenors/Petitioners,

    v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

        Respondents,

CTIA - THE WIRELESS ASSOCIATION; PCIA - THE WIRELESS INFRASTRUCTURE ASSOCIATION,

        Intervenors,

──────────────────────────────────

LEAGUE OF CALIFORNIA CITIES; CALIFORNIA STATE ASSOCIATION OF COUNTIES; LEAGUE OF OREGON CITIES; SCAN NATOA, INC.,

        Amici Supporting Petitioner.

────────────

**No. 15-1284**

────────────

CITY OF BELLEVUE, WASHINGTON; CITY OF LOS ANGELES, CALIFORNIA; CITY OF MCALLEN, TEXAS; CITY OF ONTARIO, CALIFORNIA; CITY OF REDWOOD CITY, CALIFORNIA; CITY OF SAN

JOSE, CALIFORNIA; TEXAS COALITION OF CITIES OF UTILITY
ISSUES,

                    Petitioners,

CITY OF BURLINGAME, CALIFORNIA; TOWN OF APPLE VALLEY,
CALIFORNIA,

                    Intervenors,

        v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF
AMERICA,

                    Respondents,

CTIA - THE WIRELESS ASSOCIATION; PCIA - THE WIRELESS
INFRASTRUCTURE ASSOCIATION,

                    Intervenors,

---------------------------------------

LEAGUE OF CALIFORNIA CITIES; CALIFORNIA STATE ASSOCIATION
OF COUNTIES; LEAGUE OF OREGON CITIES; SCAN NATOA, INC.,

                    Amici Supporting Petitioner.

                    ———————————

Petition for Review of an Order of the Federal Communications
Commission.  (FCC 14-153).

                    ———————————

Argued:  October 28, 2015          Decided:  December 18, 2015

                    ———————————

Before GREGORY, DUNCAN and FLOYD, Circuit Judges.

                    ———————————

Denied by published opinion.  Judge Duncan wrote the opinion, in
which Judge Gregory and Judge Floyd joined.

                    ———————————

**ARGUED:** Joseph Leonard Van Eaton, BEST BEST & KRIEGER LLP, Washington, D.C., for Petitioners/Intervenors. Maureen Katherine Flood, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondent. Megan Leef Brown, WILEY REIN LLP, Washington, D.C., for Intervenors. **ON BRIEF:** Nicholas P. Miller, BEST BEST & KRIEGER LLP, Washington, D.C., for Petitioners/Intervenors. William J. Baer, Assistant Attorney General, Robert B. Nicholson, Steven J. Mintz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jonathan B. Sallet, General Counsel, David M. Gossett, Deputy General Counsel, Richard K. Welch, Deputy Associate General Counsel, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. Joshua S. Turner, Jeremy J. Broggi, WILEY REIN LLP, Washington, D.C., for Intervenors. Javan N. Rad, Chief Assistant City Attorney, Pasadena, California; Robert C. May, III, TELECOM LAW FIRM, PC, La Jolla, California, for Amici Curiae.

---

DUNCAN, Circuit Judge:

Before the court is an administrative appeal challenging rules promulgated by the Federal Communications Commission ("FCC"). As part of a coalition of local authorities, Montgomery County, Maryland, petitions for review of the FCC's October 17, 2014 Order ("the Order"), which issued rules implementing Section 6409(a) of the Middle Class Tax Relief and Job Creation Act of 2012, 47 U.S.C. § 1455(a), also known as the Spectrum Act. Petitioners contend that the procedures established in the Order conscript the states in violation of the Tenth Amendment, and that the Order unreasonably defines several terms of the Spectrum Act.

For the reasons that follow, we conclude that the FCC's Order is fully consonant with the Tenth Amendment. We further conclude that the FCC has reasonably interpreted the ambiguous terms of Section 6409(a) of the Spectrum Act. Accordingly, we deny the petition for review.

I.

To provide context for the issues raised in the petition, we first set forth the statutory and regulatory framework from which the FCC's Order arises.

In 2012, Congress passed the Spectrum Act as part of the Middle Class Tax Relief and Job Creation Act. The Spectrum Act

4

included, among other things, a series of measures designed to encourage the growth of a robust national telecommunications network.[1] At issue in this appeal is Section 6409(a) of the Spectrum Act, entitled "Wireless Facilities Deployment: Facilities Modifications." 47 U.S.C. § 1455(a). Section 6409(a) addresses wireless providers' efforts to expand their networks by modifying existing electronic equipment that sits atop towers and other structures. If, for example, a wireless provider wanted to collocate transmission equipment on an existing tower or other site in order to increase wireless service, the provider would ordinarily need to seek local zoning approval, because the modifications would alter the physical profile of the facility.

Section 6409(a)(1) limits local authority to bar collocation or other modification efforts:

> [n]otwithstanding section 704 of the Telecommunications Act of 1996 (Public Law 104-104) or any other provision of law, a State or local government may not deny, and shall approve, any eligible facilities request for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station.

---

[1] For example, the Act reallocated a segment of the broadcast spectrum for public safety purposes, and authorized the FCC to auction part of the spectrum for commercial use. See 47 U.S.C. §§ 1421, 1451.

5

47 U.S.C. § 1455(a)(1).  Section 6409(a)(2) defines the term

"eligible facilities request" as follows:

> For purposes of this subsection, the term "eligible facilities request" means any request for modification of an existing wireless tower or base station that involves--
> (A) collocation of new transmission equipment;
> (B) removal of transmission equipment; or
> (C) replacement of transmission equipment.

47 U.S.C. § 1455(a)(2).  Together, these provisions forbid

localities from exercising their zoning authority to deny

providers' requests to modify wireless equipment, so long as the

proposed modification does not "substantially change the

physical dimensions" of the facility.  The statute does not

define what kinds of modifications would qualify as substantial.

Congress charged the FCC with implementing the Spectrum

Act, 47 U.S.C. § 1403(a), and the FCC initiated that process by

issuing a public notice of proposed rulemaking.  See In re

Acceleration of Broadband Deployment by Improving Wireless

Facilities Siting Policies, 28 FCC Rcd. 14238 (Sept. 26, 2013).

Following a contentious notice-and-comment period during which

numerous parties submitted their views, the FCC issued an Order

on October 17, 2014 implementing Section 6409(a).  In re

Acceleration of Broadband Deployment by Improving Wireless

Facilities Siting Policies, 29 FCC Rcd. 12865 (Oct. 17, 2014),

amended by 30 FCC Rcd. 31 (Jan. 5, 2015).  These rules are

codified at 47 C.F.R. § 1.40001.

6

The Order begins by noting the underlying Congressional concern that municipal permit review processes were hindering efforts to expand wireless networks.

> Despite the widely acknowledged need for additional wireless infrastructure, the process of deploying these facilities can be expensive, cumbersome, and time-consuming. . . . [Among other requirements], parties must typically obtain siting approval from the local municipality. . . .
> Although these review requirements serve important local and national interests, local and Federal review processes can slow deployment substantially, even in cases that do not present significant concerns.

Order ¶¶ 9–10. With the aim of "reduc[ing] regulatory obstacles and bring[ing] efficiency to wireless facility siting," the Order turned to the task of implementing Section 6409(a) and defining its terms. Id. ¶ 10.

Two aspects of the Order are relevant to this appeal. The first implements the statute's directive that localities "shall approve" applications by establishing what the Order calls a "deemed granted remedy." Order ¶ 227. The second clarifies what kinds of physical modifications are "substantial," and what types of facilities qualify as "wireless towers" and "base stations" within the meaning of the statute. We briefly summarize each before turning to Petitioners' arguments.

7

A.

To implement the Spectrum Act's mandate that localities "shall approve" facility-modification requests covered by Section 6409(a), the Order establishes a so-called "deemed granted remedy." Under this procedure, when a locality receives a covered facility-modification request, it has sixty days to review the application, if it elects to review the request at all. 47 C.F.R. § 1.40001(c). Within that sixty-day period, the locality "shall approve the application unless it determines that the application is not covered by this section."[2]   Id. § 1.40001(c)(2). If the locality fails to act before the sixty-day period expires, "the request shall be deemed granted." Id. § 1.40001(c)(4). However, the grant "does not become effective until the applicant notifies the [locality] in writing after the review period has expired . . . that the application has been deemed granted." Id. The rules authorize applicants to bring claims relating to Section 6409(a) applications in "any court of competent jurisdiction," and the Order explains that this provision permits applicants to seek declaratory judgments memorializing the grant. Id. § 1.40001(c)(5); Order ¶¶ 235-36.

---

[2] Of course, the locality may exercise its discretion to grant the request even if it determines that the facilities request is not covered by Section 6409(a).

The Order acknowledges that Section 6409(a) "does not expressly provide for a time limit or other procedural restrictions" on municipal review of applications. Order ¶ 212. However, the FCC determined that the "deemed granted remedy" was consistent with Section 6409(a), which states that localities "may not deny, and shall approve" qualifying applications. Id. ¶ 227. As the FCC explained,

> [t]his directive leaves no room for a lengthy and discretionary approach to reviewing an application that meets the statutory criteria; once the application meets these criteria, the law forbids the State or local government from denying it. . . . [W]ithholding a decision on an application indefinitely . . . would be tantamount to denying it, in contravention of the statute's pronouncement that reviewing authorities "may not deny" qualifying applications.

Id. In light of these concerns, the FCC concluded that "the text of Section 6409(a) supports adoption of a deemed granted remedy, which will directly serve the broader goal of promoting the rapid deployment of wireless infrastructure." Id.

B.

The FCC's Order also undertakes the task of interpreting several undefined terms. Order § V. Petitioners challenge two in particular: what is a "base station" that may be modified, and what does it mean to "substantially change" a facility?

9

First, the FCC defined the term base station to include "structures other than towers that support or house an antenna, transceiver, or other associated equipment," even if the structure was not built primarily for that purpose.[3]  Id. ¶ 21; 47 C.F.R. § 1.4001(b)(1)(iii).  In other words, a base station can be any structure--for example, a building or a utility pole--that has transmission equipment installed on top.

Second, the FCC has provided a multi-part definition establishing objective criteria for determining when a proposed modification "substantially changes the physical dimensions" of a facility:

> for towers outside of public rights-of-way, it increases the height by more than 20 feet or 10%, whichever is greater; for those towers in the rights-of-way and for all base stations, it increases the height of the tower or base station by more than 10% or 10 feet, whichever is greater;

> for towers outside of public rights-of-way, it protrudes from the edge of the tower more than twenty feet, or more than the width of the tower structure at the level of the appurtenance, whichever is greater; for those towers in the rights-of-way and for all base stations, it protrudes from the edge of the structure more than six feet;

> it involves installation of more than the standard number of new equipment cabinets for the technology involved, but not to exceed four cabinets;

---

[3] By contrast, a tower is a structure whose primary purpose is supporting communications equipment.  47 C.F.R. § 1.40001(b)(9).

10

it entails any excavation or deployment outside the current site of the tower or base station;

it would defeat the existing concealment elements of the tower or base station; or

it does not comply with conditions associated with the prior approval [of the facility] unless the non-compliance is due to [a change that does not constitute a "substantial change" under the preceding standards].

Order ¶ 21.[4]  Notwithstanding this definition, the FCC explains in the Order that localities may continue to condition approval on compliance with "generally applicable building, structural, electrical, and safety codes" and other public safety laws.  Id. ¶¶ 21, 202.  And, of course, localities are permitted to deny applications if they determine that the proposed modification is not covered by the FCC's Order implementing Section 6409(a), such as a proposal to add five equipment cabinets to a utility pole.

## II.

On appeal, Petitioners contend that the FCC's Order violates the Tenth Amendment by compelling the states to grant permit applications, and they assert that the Order defines

_____

[4] These standards are codified at 47 C.F.R. § 1.4001(b)(7).

11

certain statutory terms in a manner inconsistent with the text of the Act. We consider these arguments in turn.

### A.

Petitioners argue that the Order violates the Tenth Amendment by compelling local and municipal governments to participate in federal regulatory efforts by approving infrastructure permits. Petitioners take particular issue with the "deemed granted" procedure, which they characterize as "direct regulation of the conduct of the locality's legislative power, which the Tenth Amendment prohibits." Petitioners' Br. at 57. We have jurisdiction to review constitutional challenges to executive agency action pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2), which instructs a reviewing court to set aside agency action that is "contrary to constitutional right" or otherwise unlawful.

As the Supreme Court discussed in Printz v. United States, 521 U.S. 898 (1997) and New York v. United States, 505 U.S. 144 (1992), the Tenth Amendment forbids the federal government from requiring states to enforce federal laws. In New York, the Court explained that

> [e]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts. . . . [T]he Commerce Clause, for example, authorizes

12

> Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.

505 U.S. at 166. Thus, neither Congress nor the FCC may compel the states to administer federal regulatory programs or pass legislation. This "anti-commandeering" principle is cabined, however. For example, a law that conditions federal funding on state implementation of a federal program does not violate the Tenth Amendment, unless the inducement of the funding is "so coercive as to pass the point at which pressure turns into compulsion." South Dakota v. Dole, 483 U.S. 203, 211 (1987) (quotation omitted); Kennedy v. Allera, 612 F.3d 261, 269 (4th Cir. 2010). Similarly, the Tenth Amendment presents no bar to a federal rule that asks the states to choose between regulating according to federal standards and having a federal agency step in to regulate. Verizon Maryland, Inc. v. Global NAPS, Inc., 377 F.3d 355, 368 (4th Cir. 2004).

Upon review of the FCC's Order, we readily conclude that the FCC's "deemed granted" procedure comports with the Tenth Amendment. As a practical matter, the Order implementing Section 6409(a) does not require the states to take any action at all, because the "deemed granted" remedy obviates the need for the states to affirmatively approve applications. Instead, the "deemed granted" procedure allows the applications to be granted by default if the state does not affirmatively approve

13

them within sixty days.  As the FCC points out in its Order, the point of the "deemed granted" provision is to ensure that collocation applications are not mired in the type of protracted approval processes that the Spectrum Act was designed to avoid. Order ¶ 227.  Moreover, the "deemed granted" procedure provides a remedy to ensure that states do not circumvent statutory requirements by failing to act upon applications.  Id. The purpose and effect of Section 6409(a) is to bar states from interfering with the expansion of wireless networks.  To achieve that end, the Act preempts local regulation of collocations and bars states from denying facility modification applications that meet certain standards.  The FCC's Order does no more than implement the statute.

Despite the fact that the Order does not require states to take any action at all, Petitioners insist that the Order commandeers the states and compels localities to administer the Spectrum Act.  They argue that, even under a default-grant scenario, it is the state itself that is granting the application.  Thus, according to Petitioners, the Order forces states to give collocation applications the imprimatur of state approval.  But these applications are granted only by operation of federal law, and the Order permits applicants to initiate a declaratory judgment action to seek "some form of judicial imprimatur" for an application that has been deemed granted.

14

Id. ¶¶ 235-36. Therefore, if the permit "grants" bear the imprimatur of any authority, it is federal, and not local. For this reason, Petitioners cannot argue that the Order requires localities to exercise their legislative power to grant applications.

Because the Order does not require the states to take any action whatsoever, the FCC's rules are a far cry from the statute struck down in Printz, which required states to run background checks on handgun purchases. Printz, 521 U.S. at 904-05. Likewise, the Order bears no resemblance to the statute in New York, which required states to enact state laws providing for the disposal of radioactive waste within state borders or else take title and possession of the waste themselves. New York, 505 U.S. 151-52. Functionally, what has occurred here is that the FCC--pursuant to properly delegated Congressional authority--has preempted state regulation of wireless towers. That is entirely permissible under our system of federalism. We therefore conclude that Petitioners' Tenth Amendment challenge lacks merit.

B.

Having determined that the FCC's "deemed granted" procedure is constitutional, we next address Petitioners' contention that

15

the FCC has unreasonably defined several terms of the Spectrum Act.

Pursuant to the Administrative Procedure Act, we will set aside the FCC's order only if we conclude that its rules are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Furthermore, the FCC's interpretation of Section 6409(a) is entitled to deferential review under Chevron, USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). Under Chevron, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." Id. at 844. Here, a Chevron analysis is appropriate because the issue before us involves the FCC's interpretation of a statute it is charged with administering. See 47 U.S.C. § 1403(a).

At step one of the Chevron framework, the court must determine whether Congress "has directly spoken to the precise question at issue," or whether, instead, the terms are ambiguous. Othi v. Holder, 734 F.3d 259, 265 n.4 (4th Cir. 2013) (quoting Chevron, 467 U.S. at 842). There is no question that the terms of the Spectrum Act at issue here are ambiguous.[5]

---

[5] Petitioners do not dispute that the term "substantial" is ambiguous. With respect to the term "base station," Petitioners assert, without further explanation, that "while the term 'base
(Continued)

Accordingly, this court's review is governed by step two of the Chevron analysis, under which the sole inquiry is whether the FCC's interpretation of the terms "is based on a permissible construction of the statute." Schafer v. Astrue, 641 F.3d 49, 54 (4th Cir. 2011)(quoting Chevron, 467 U.S. at 843).

Against this standard, we review Petitioners' challenge to the manner in which the FCC has defined the two terms referenced earlier: "substantially change" and "base station."

1.

The FCC's Order provides objective and numerical standards to establish when an eligible facilities request would "substantially change the physical dimensions" of the facility. For example, as we have noted, a change would be substantial if it entailed any excavation or deployment beyond the current site of the tower or base station.

Petitioners challenge these standards on several grounds, but they have a common theme: Petitioners believe that

station' may be ambiguous in some regards (whether it includes power supplies located at a site, for example), its ordinary meaning does not include structures." Petitioners' Reply Br. at 17. Aside from this one sentence, Petitioners have entirely failed to engage with a Chevron analysis, and thus it is difficult to determine their position with respect to the ambiguity of this term. However, it is clear that "base station" is amenable to multiple interpretations, and thus we conclude that the term is ambiguous under Chevron step one.

17

municipalities should be able to review each facility application to determine whether the proposal would represent a "substantial" modification of the original structure. This argument, at its core, takes issue with the fact that the Spectrum Act displaces discretionary municipal control over certain facility modification requests. But that is exactly what Congress intended by forbidding localities from denying qualifying applications. The FCC's objective criteria are entirely consistent with this purpose, because the concrete standards in the Order eliminate the need for protracted review. By providing concrete, non-discretionary standards, the FCC has limited the local review process to the simple question of whether the proposed modification falls within the statutory parameters.

To avoid this conclusion, Petitioners style their argument as a question of statutory interpretation, claiming that the term "substantial" is not amenable to the objective standards the FCC has used, but instead requires a contextual inquiry. We find this argument to be unpersuasive, given that the provision at issue addresses "physical dimensions." It was not unreasonable for the FCC to supply a strictly numerical definition of substantiality in this context, because the physical dimensions of objects are, by their very nature,

18

suitable for regulation through quantifiable standards.[6] Petitioners attempt to draw comparisons to laws employing a context-specific approach to analyzing work under copyright law, Petitioners' Br. at 31, but it should be obvious that rules for comparing artwork and rules for determining whether the height of utility poles have been substantially increased need not employ the same analysis.

Tellingly, Petitioners do not argue that the FCC should have supplied <u>different</u> objective standards for physical dimensions.[7] Nor do they argue that the FCC itself should

---

[6] Along these same lines, Petitioners also argue that the FCC can only interpret the term "dimensions" if it passes regulations that address all three spatial dimensions of each facility. Petitioners' Br. at 33-34. Specifically, according to Petitioners, the FCC's interpretation of "substantially" is unreasonable because the FCC has focused on height and distance from a building, but not depth. Applying <u>Chevron</u> deference, we cannot conclude that it was unreasonable for the FCC to define "dimensions" without addressing in each instance the height, depth, width, and volume of each object. Nothing in the text of the statute appears to require such a granular approach.

[7] For example, Petitioners point out that utility poles are typically around 37.5 feet high, and the FCC's rules categorize as "insubstantial" a ten-foot increase of such a pole. Petitioners' Br. at 38. Petitioners strenuously argue that such a ten-foot increase would be substantial, yet Petitioners do not offer any substitute numerical threshold. That is, Petitioners do not concede that a rule that permitted a five or even a three-foot increase of utility poles would be insubstantial. Thus, it appears that Petitioners are mainly challenging the FCC's decision to select objective, numerical criteria, instead of preserving municipal discretion to review each application in context. In any event, we do not find that permitting a
(Continued)

19

undertake to review each application for substantiality. Instead, Petitioners repeatedly argue that the FCC should have permitted municipalities to review applications on a case-by-case basis. See, e.g., Reply Br. at 8 n.8 ("[T]he rule, to be rational, should have allowed localities to review an attachment involving more than a de minimis increase or [sic] width."). Thus, their dispute is not with the particular standards the FCC has selected, but with the fact that the FCC has set forth objective standards that divest municipalities of their reviewing discretion. This appeal is not the proper forum for municipal grievances about federal regulations that displace the discretion of local governments. See Chevron, 467 U.S. at 866 ("When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.").

Contrary to Petitioners' arguments, the FCC's standards do incorporate considerations of context, even though they do not permit municipalities to conduct a contextual review of each facility. For example, under the FCC's rules, the threshold for

provider to raise a 37.5 foot pole to a height of 47.5 feet is an unreasonable interpretation of the term "substantial."

20

substantiality is lower for modifications that occur in public rights-of-way. The Order also applies different standards to base stations than it does to towers (which are usually in more remote locations). Moreover, Section 6409(a) and the Order preserve the FCC's obligations to conduct contextualized assessments of projects that affect historically or environmentally sensitive areas, and preserve local authority to condition approval on compliance with "generally applicable building, structural, electrical, and safety codes" and other public safety laws. See Order ¶ 21; 47 U.S.C. § 1455(a)(3) ("Nothing in [Section 6409(a)(1)] shall be construed to relieve the Commission from the requirements of the National Historic Preservation Act or the National Environmental Policy Act of 1969."). The FCC has also preserved existing concealment requirements for facilities. Order ¶ 21; 47 C.F.R. § 1.40001(b)(7)(v). Thus, the Order does incorporate considerations of context in its definitions of substantiality.[8]

---

[8] Petitioners also argue that the FCC's concrete standards are unreasonable, because although the FCC based them upon prior standards (set forth in "programmatic agreements") relating to environmental and historical assessments of collocation projects, the FCC has neglected to include the discretionary elements of the prior approach. Petitioners' Br. at 7-8, 39. The programmatic agreements set forth standards for determining when a proposed collocation project would be "substantial" such that a historical and environmental impact assessment was required. These standards permitted a complaint procedure, under which an application with a municipal complaint received (Continued)

21

Lastly, Petitioners argue that the FCC has erred by extending the Order's rules to facilities that localities initially approved only on the condition that the facility not be modified in the future. According to Petitioners, any expansion of these facilities is per se "substantial" and allowing such facilities to expand runs counter to the purposes of the Spectrum Act. Petitioners reason that permitting modifications of these facilities will make the states wary of granting new permits out of fear that their conditions will not be honored (and that any grant of a permit may lead to expansions beyond the state's control). These are policy arguments, not statutory interpretation arguments. The statutory interpretation question is simple. The FCC's view is that, regardless of the circumstances under which a provider obtained permission to build a facility, now that it has been built, any expansion proposals are reviewed based upon whether

---

additional review, either before or after the modification was constructed. Adding more stringent review procedures makes good sense in this context, where considerations of historical and environmental impact are at issue. By contrast, it was entirely reasonable for the FCC not to employ a complaint procedure in the broader context of general facilities applications. Regardless, the FCC has represented that municipalities may avail themselves of the FCC's general waiver procedure if the FCC's 6409(a) rules create outlier cases. See Respondent's Br. at 43 (citing 47 C.F.R. § 1.925(b)(3)(i), (ii)). Thus, the waiver procedure provides a forum for municipal complaints, even if the procedure is not formally part of the Order.

the proposed expansion will substantially increase the size of the facility. This view is faithful to the text of Section 6409(a), which does not contain any exemptions for facilities that exist on condition of non-modification. We cannot conclude, under Chevron, that the FCC's interpretation is unreasonable.

2.

Finally, Petitioners argue that the FCC has erroneously defined the term "base station." The FCC has defined "base station" to mean "the equipment and non-tower supporting structure at a fixed location that enable Commission-licensed or authorized wireless communications between user equipment and a communications network." Order ¶ 167 (emphasis added). According to Petitioners, this definition is unreasonable because the term "base station" refers only to transmission equipment, and not the structure upon which the equipment sits, such as a utility pole. Petitioners also argue that defining "base station" to encompass support structures is unreasonable, because the FCC has never employed this definition in previous regulations.

Regardless of how other regulations may have addressed base stations, defining that term to encompass support structures comports with the thrust of Section 6409(a). The statutory text places base stations on equal footing with towers, and the Act

23

clearly contemplates modifications of both types of facilities. Section 6409(a)(1) discusses "modification of an existing wireless tower or base station," and Section 6409(a)(2) clarifies that modification includes "modification of an existing wireless tower or base station that involves . . . collocation of new transmission equipment." Given that a wireless tower is essentially a support structure with electronic equipment on top, it would be anomalous to interpret the statute in a manner that permitted the FCC to define towers to encompass the entire structure, but forbade the FCC from defining base stations to encompass the entire facility.

Moreover, the term "base station" is a term that must be defined in the context of its given regulatory scheme. Here, including support structures in the definition of base stations is consistent with Congress's intent to promote the expansion of wireless networks through collocation. Considering that collocation often adds electronic equipment that requires structural enhancement to increase its load-bearing capacity, we agree with the FCC that collocation would be "conceptually impossible" if the definition of "base station" did not include support structures. Order ¶¶ 169, 180.

Petitioners next argue that the FCC's definition is overly broad. They claim that by essentially defining a base station as any structure with an antenna on top, the FCC's definition of

24

"base station" also encompasses towers. Given that Section 6409(a) mentions both towers and base stations, Petitioners argue that the FCC's interpretation of the statute renders the term "tower" superfluous. The FCC counters that its definition of "tower" includes towers that do not currently support antennas, and that its definition of base stations expressly excludes towers, thereby rendering the two definitions distinct. Respondent's Br. at 48. We agree with the FCC's explanation in the Order of the distinction between these terms:

> [W]e interpret "base station" not to include wireless deployments on towers. Further, we interpret "tower" to include all structures built for the sole or primary purpose of supporting Commission-licensed or authorized antennas, and their associated facilities, regardless of whether they currently support base station equipment at the time the application is filed. Thus, "tower" denotes a structure that is covered under Section 6409(a) by virtue of its construction. In contrast, a "base station" includes a structure that is not a wireless tower only where it already supports or houses such equipment.

Id. ¶ 169. Given these definitions, it is difficult to conceive of a structure that could qualify as both a tower and a base station. The FCC's Order clearly provides distinct definitions for the terms of Section 6409(a), and we find unpersuasive Petitioners' arguments to the contrary.

We emphasize that the FCC's interpretation of "base station" is entitled to deference under step two of Chevron. It is not enough for Petitioners to argue that a better definition

25

of "base station" would have excluded support structures. Instead, Petitioners have the burden of showing that the FCC's definition is an unreasonable interpretation of the Spectrum Act.  We conclude that Petitioners have failed to carry their burden.

## III.

For the foregoing reasons, the petition for review is

DENIED.

26